197 So.2d 664 (1966)
WHITEHALL OIL COMPANY, Inc. et al., Plaintiffs-Appellees,
v.
Richard O. ECKART et al., Defendants-Appellants.
No. 1941.
Court of Appeal of Louisiana, Third Circuit.
March 21, 1966.
Rehearing Denied April 12, 1967.
On Motion to Amend Decree April 12, 1967.
Writ Granted June 9, 1967.
Andrus & Pavy, by Alex L. Andrus, Jr., Morgan J. Goudeau, III, Opelousas, for plaintiffs-appellants-appellees.
*665 Voorhies, Labbe, Fontenot, Leonard & McGlasson, by Bennett J. Voorhies, Lafayette, Pavy & Boudreaux, by A. V. Pavy, Opelousas, Kantrow, Spaht, Weaver & Walter, by Carlos G. Spaht, Baton Rouge, for defendants-appellees-appellants.
Lewis & Lewis, by Seth Lewis, Jr., Boagni & Boagni, by Charles F. Boagni, III, Opelousas, Liskow & Lewis, by William M. Hall, Jr., Lafayette, for plaintiffs-appellees.
En Banc.
TATE, Judge.
This is a concursus proceeding. LSA-C.C.P. Art. 4561 et seq. The owners of a mineral lease deposited a disputed share of an overriding royalty interest into the registry of the court. Two sets of defendants are impleaded to assert claims against this disputed royalty interest. They are opposing groups of the heirs (or their successors) of the late Edward M. Boagni, Sr. We will denote these respective opposing defendants as the Edward-Vincent group and as the Susan-Alice group.
The Edward-Vincent group granted a mineral lease of a tract ("Lot G") then or formerly owned by it. The Susan-Alice group owned a mineral royalty interest affecting this land. By two instruments separate from the lease the mineral lessee also granted the Edward-Vincent group an overriding royalty interest as consideration for their leasing the tract.
The issue of this appeal is whether the Susan-Alice group is entitled to share in the overriding royalty granted to the Edward-Vincent group. The question is whether this overriding royalty interest carved from the mineral lessee's share of production is nevertheless "royalty" within the scope of the mineral royalty interest reserved or granted to the Susan-Alice group when the tract was originally conveyed to a predecessor of the Edward-Vincent group. The interpretation of this original royalty reservation is the principal issue of this litigation.[1]
Facts.
By the partition agreement of November 23, 1942, the heirs of the late Edward M. Boagni each received the title to certain tracts of land, with the other coheirs[2] being reserved or granted a mineral royalty interest affecting the tracts so partitioned. The mineral royalty agreement is set forth as the Appendix to this opinion. The royalty interests created by this instrument have never prescribed, since production ensued before prescription accrued.
The general scheme of the royalty agreement is that the owner who receives the surface title of land in the partition is also reserved or granted a total of 60% of mineral royalties to result from production from it. The other heirs are reserved or granted the remaining 40%, divided in specified proportions for each. The surface owner is granted the exclusive leasing rights and also the right to retain any consideration paid for granting the lease "except royalties".
The disputed royalties result from mineral production from Lot "G" of the lands partitioned. For present purposes, it is not disputed that by the terms of the partition the Edward-Vincent group has, as owners of it, the executive right with regard to Lot *666 "G" (i. e., the exclusive power to grant mineral leases).
On December 13, 1958, the Edward-Vincent group executed a mineral lease of this tract to Craft Thompson. (He subsequently assigned it to the plaintiff Whitehall.) This lease provides that the lessor is to receive royalties of one-eighth (1/8th) of all production.
Simultaneously with execution of the lease, the lessee Thompson executed two instruments which additionally assigned overriding royalty interests to the members of the Edward-Vincent group. The overriding royalty interest so assigned totals 20% (1/5th) of all mineral production to be obtained from Lot "G" under the terms of the lease.[3] This overriding royalty is granted by the lessee to the Edward-Vincent group from the lessee's seven-eighths (7/8ths) share of production which the lessee was to retain under the lease.
Under the terms of the original partition's royalty agreement (see Appendix), the Edward-Vincent group is entitled to receive 71% of royalties from mineral production.[4]
The Susan-Alice group is to receive 29% of the royalties.[5]
The parties all concede that, in accordance with these partition terms, the Susan-Alice group is to receive 29% (and the Edward-Vincent group 71%) of the one-eighth share of production specified by the lease as payable as royalty to the lessor. This litigation concerns whether the Susan-Alice group is entitled also to receive 29% of the additional 20% overriding royalties assigned by the lessee solely to the Edward-Vincent group. The plaintiff mineral-lease owners deposited this 29% (only) of the overriding royalties into court. The proceedings concern only the disputed ownership to this 29%.
Before proceeding to the resolution of the issues of law, we think it fitting to state that we agree with the trial court's decision of the factual issues, namely:
In exercising the executive power to grant the lease and in negotiating for the overriding royalties, Edward M. Boagni, Jr., acted honorably and openly and in accord with what he felt were the contractual rights of the Edward-Vincent parties he represented as agent. He could have accepted for them a cash bonus of $52,000 for the lease, and all parties concede that under the contract the Edward-Vincent group was entitled to keep entirely for themselves any such cash bonus. Instead, he negotiated for the overriding royalty interest at issue, which the lessee granted to the Edward-Vincent group[6] in lieu of the $52,000 cash bonus. This overriding royalty interest was granted as a bonus or consideration for the granting of the lease by the Edward-Vincent group, which had the executive (exclusive leasing) power with regard to the tract leased.
The Original Royalty Reservation Agreement and its Application to the Facts.
The trial court held that there is a distinction between a "lease royalty" and an *667 "overriding royalty". It viewed the former to be the royalty stipulated by the lease and the latter to be royalty created out of the lessee's interest and granted as a bonus or consideration for the execution of the lease. In holding that the Edward-Vincent group was entitled to receive all the overriding royalties, the trial court essentially held that by the terms of the original royalty grant (see Appendix) the "executive"[7] was entitled to receive any consideration or bonus paid for granting the lease, including overriding royalties, and that the "non-participating" royalty owners[8] were entitled to share in royalties in excess of one-eighth only if the lease itself specified that such excess royalty was payable to the lessor.
We respectfully disagree. We feel to be inapplicable the decisions relied upon by the appellees and accepted by the trial court as governing. We view the present question as expressly regulated by the terms of the present royalty agreement. This royalty agreement, contained in the original partition, includes what the parties denote as the "except-royalties" and the "excess-royalties" clauses. (See italicized phrasing in Appendix setting forth entire agreement.) The proper interpretation of these two clauses in the light of the intent reflected by the entire agreement is, in our opinion, determinative of the ownership of the overriding royalty interest in dispute.
The agreement first provides that the non-participating royalty owners are to receive mineral royalty rights totaling 40% of one-eighth of the mineral production from the land. Under the "except" clause, the executive is to receive "any and all bonuses, rentals and other considerations (except royalties) paid for or in connection with any such lease or other contract * * *." The agreement also provides that the non-executive royalty interests should in no event receive less than one-eighth of any mineral production. Finally, the "excess" clause pertinently provides that the non-executive royalty interests should participate in the specified percentages (i. e., totaling 40%) of any "excess royalties" if the executive granted a lease "providing for the payment of royalties on oil, gas or other minerals in excess of one-eighth (1/8th) * * *."
Used in connection with mineral leases, the terms "bonus", "rental", and "royalty" have definite meanings in the ordinary and popular sense. "Bonus" is usually defined as the consideration paid or agreed to be paid for the execution of the lease in addition to the usual royalties reserved in the lease, whether paid in cash or payable out of production. "Rental" is usually defined as a consideration for the privilege of delaying drilling operations, and it is sometimes referred to as the "delay rental". "Royalty" is usually defined as the share of the product or the proceeds therefrom, reserved to the owner for permitting another to use the property.
See: Texas Co. v. Fontenot, 200 La. 753, 8 So. 689 at 693 (syllabus 5); 3A Summers, Oil and Gas, Sections 571, 578, and 586 (1958 permanent volume); 2 Williams and Meyers, Oil and Gas Law, Section 301 (1964); see also: Williams and Meyers, Manual of Oil and Gas Terms, "Bonus", p. 19, "Delay rental", p. 56, and "Royalty", p. 213 (1957).
However, in mineral law the term "royalty" has a broader meaning than that of being merely "rent royalty" prescribed by the lease as payable to the lessor. In its broader sense, "royalty" refers to a share of production, free ordinarily of the expenses *668 of production; this definition includes not only rent royalty, but also such interests as a royalty interest created independently of any existing lease ("royalty per se") or an "overriding royalty" interest granted by the lessee from its working interest under a particular oil or gas lease. Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38; Daggett, Mineral Rights in Louisiana, Chapter VI, "Royalty", especially Sections 60, 63, 64, and 66 (revised edition 1949); 3A Summers, cited above, Section 599; Williams and Meyers, Manual of Oil and Gas Terms, "Royalty", p. 213 (1957).
Thus, with regard to the present facts, the overriding royalty granted to the executive interests in connection with their execution of the present mineral lease cannot necessarily be classified on an either-or basis as bonus or royalty; for it may be both. As stated at Summers, Section 586, p. 74: "* * * Bonus and royalty, considered in the popular meanings, attributed to them, are conflicting and overlapping. If a bonus is in the form of an oil payment or overriding royalty, it is indistinguishable from royalty, defined as a payment out of production. Bonus, defined as consideration for the execution of a lease, furnishes no basis for distinguishing it from royalty, for royalty is also consideration for the lease. Even where bonus is defined as consideration for the lease in addition to the usual royalty, it may be indistinguishable from royalty, depending upon the form of payment * * *."
To assist us in determining whether the present non-executive interests should share in the overriding royalty, the parties have cited cases which arise from situations where the instrument creating the respective interests permitted the executive to retain the entire "bonus" and restricted the non-executive interests to a share in the "royalty" only. In those situations, the courts have reached differing conclusions as to whether the overriding royalty granted to the executive as a consideration for executing the lease is "bonus" for the executive alone or is instead "royalty" which must be shared by him with the non-executive interests. 2 Williams and Meyers, Oil and Gas Law, Section 328 (1964); cf. 3A Summers, cited above, at Section 586.
Some courts have considered as "bonus" whatever is paid in excess of the one-eighth or other percentage which constitutes the usual and ordinary landowner's royalty reservation in the area.[9] Another view is that the overriding royalty which does not total a sum certain but which instead is to continue throughout the life of the lease is regarded as royalty, irrespective of percentage amount.[10] Also, the courts have rather consistently held that oil payments are "bonuses" rather than "royalty"[11] if they amount to a sum certain to be paid out of overriding royalty from the lessee's share of production.
But this jurisprudence is not really pertinent. None of the decisions contained a royalty agreement similar to the present, which specifically provides for the non-executive interests to share in all "royalties" including those in excess of one-eighth, and where the agreement specifically excepts "royalties" from the "bonuses, rentals and other considerations" payable solely to the executive "for or in connection with the lease."
For similar reasons, Uzee v. Bollinger, La.App. 1 Cir., 178 So.2d 508, is not applicable. *669 There, the non-executive mineral owner retained a one-fourth interest in the minerals, with the executive being entitled to lease the tract and to retain the whole of the "rental or bonus money from said lease". The executive by collateral agreements received certain overriding royalty. The non-executive owner's right to share in this overriding royalty was rejected. The court held that the executive was under no fiduciary duty to secure the highest possible royalty for the non-executive interests.[12] In the Uzee case there was no provision that any royalties were excepted from the executive's right to receive bonuses paid for the execution of the lease.
By the present royalty agreement, however, the parties expressly agreed that royalties were excepted from the consideration or bonuses payable solely to the executive. Arguably, the "excess-royalties" clause applied only where the lease itself expressly provided for the royalties to the lessor to be in excess of one-eighth of the production. However, construing the "except-royalties" clause in conjunction with the "excess-royalties" clause, the intent reflected by the instrument as a whole is for the non-executive interests to receive their share of all royalties obtained by the executive as a result of ("in connection with") leasing the tract, whether such royalties are "lease" or "overriding".
The parties all concede that the non-executive interests would be entitled to share in the excess royalties if the lease terms had provided for a "lease" royalty payable to the lessor in a total amount which included the one-fifth overriding royalty in addition to the one-eighth royalty specified in the lease itself. This, of course, is at the very least what the "excess-royalties" clause expressly provides. Considering also the "except-royalties" clause, in our opinion the executive cannot prevent non-executive interests from similarly sharing in any excess royalty by labeling it as "overriding" and receiving it by a separate instrument rather than by the lease itself.
Conclusion.
We therefore conclude that the Susan-Alice group is entitled to receive the disputed 29% of the overriding royalties in the proportions (see footnote 5) specified by the original partition royalty agreement. Likewise the claims of the Edward-Vincent group to this disputed 29% must be rejected.
For the reasons assigned, we set aside and annul the trial court judgment, and we now decree that the royalties on deposit in this suit be paid to the following parties in the percentages set forth following their names: Mrs. Susan Boagni Gardner, eleven per cent (11%); Mrs. Alice Boagni Heard, eleven per cent (11%); and Richard O. Eckart, seven per cent (7%). Both the costs taxed to this suit by the trial court and the costs of this appeal are taxed to the mass on deposit in the registry of the court. See LSA-C.C.P. Art. 4659.
Revised and rendered.
FRUGÉ, J., dissents believing that the trial Judge's ruling is correct and should have been affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
FRUGÉ, J., votes for rehearing.

On Motion to Amend Decree.
En Banc.
PER CURIAM.
By motion to amend our decree, the prevailing defendants-appellees called to our attention that our decree apparently only awards a total of 29% of the amount on deposit to them, although the intent of the opinion was to award them the entire *670 amount on deposit (which constituted a disputed 29% of the royalties). In clarification of our original decree, we state that the royalties on deposit in this suit are to be paid the following parties in the percentages set forth following their names: Mrs. Susan Boagni Gardner, 11/29ths; Mrs. Alice Boagni Heard, 11/29ths; and Richard O. Eckart, 7/29ths.
As thus clarified, our original decree is reinstated.
Decree amended.

APPENDIX
Excerpted from the partition agreement is the mineral royalty reservation at issue in full (Italics ours):
To have and to hold in full ownership forever unto MRS. ALICE BOAGNI ROZAS, the properties above described as forming Lot 1, unto VINCENT BOAGNI, the properties above described as forming Lot 2, unto MRS. SUSAN BOAGNI GARDNER, the properties above described as forming Lot 3, and unto EDWARD M. BOAGNI, JR., the properties above described as forming Lot 4, subject to the following disposition of the mineral rights, which inhere in the properties received by each, to wit:
In order that all of the parties hereto may participate to the extent hereafter set forth in the oil, gas and other mineral royalties which might accrue out of the production of any of such minerals from said lands, each of the parties hereto, as part of this agreement of partition, reserves in and to the lots hereby allotted to the others the oil, gas and mineral royalties equal to eleven per centum (11%) of one-eighth (1/8th) of all the oil, gas and other minerals produced from said lands either by the owner of the lands or of the mineral rights therein or by any lessee or others operating under any contract whatsoever. And in consideration of the transfer of certain rights to the parties hereto by Richard O. Eckart under another partition of even date herewith, all of the Appearers herein transfer and assign unto the said Richard O. Eckart, his transferees and assigns, oil, gas and mineral royalty rights in and to the lots respectively allotted to them equal to seven per centum (7%) of one-eighth (1/8th) of all the oil, gas and other minerals produced from said lands; it being the intention hereof that the lot allotted to each of the said parties shall be subject to oil, gas and mineral royalty rights vested in the other parties and in the said Richard O. Eckart to the extent of a total of forty per centum (40%) thereof, leaving vested in the owner of each of said lots sixty per centum (60%) of all of such royalties to accrue under any lease or other contract affecting said land. The royalty rights so reserved by the said parties in and to the lots allotted to the others, including the rights of Richard O. Eckart, shall be and remain an obligation attached to said lands binding on any owner or owners thereof or of the mineral rights therein or lessees operating thereon, such royalties to be delivered or paid free of expense out of any oil, gas or other minerals produced from said property by any such owner or lessee, subject, however, to such proportionate deductions as may apply to the lessor's royalty under any lease affecting the land, but the owner of the fee title to each of the said lots, as herein allotted, shall have the right to grant any lease or leases affecting his or her respective lands without the concurrence of the other royalty owners therein and any and all bonuses, rentals and other considerations (except royalties) paid for or in connection with any such lease or other contract shall be payable only to the owner of the lands so leased and the other parties as royalty owners shall not participate therein. It is further provided, however, that in the event any owner should grant a lease or leases affecting his or her land as herein allotted providing for the payment of royalties on oil, gas or other minerals in excess of one-eighth (1/8th) of the whole produced from said land then the other owners of the royalty rights therein reserved or transferred to them shall participate in such excess royalties in the same percentages herein set forth; and the total royalties in which said parties shall participate shall in no event be less than one-eighth (1/8th) of the whole of the oil, gas or other minerals produced from the land. The rights and obligations herein set forth shall inure to the benefit of and be binding on the heirs, successors and assigns of all of said parties; but the sale by any one of the parties hereto of his or her lot, or any part thereof, in fee or of the mineral rights therein shall not carry with it any of the royalty rights of said party in lands of the other owners hereunder unless specifically included in such sale.
NOTES
[1] The issues are identical to those in a declaratory action brought by a member of the Susan-Alice group to obtain an interpretation of this royalty reservation. That suit was consolidated with the present for appeal and trial and is decided by us this date. Gardner v. Boagni, 197 So.2d 671.

Two other suits argued before us at the same hearing also involved the same parties; they concern entirely different issues affecting other Boagni estate tracts. Whitehall Oil Co., Inc. v. Heard, 197 So.2d 672; Whitehall Oil Co. Inc. v. Boagni, 197 So.2d 679.
[2] These include, for present purposes, a testamentary heir, Richard O. Eckart, who was granted a 7% mineral royalty right affecting the property partitioned in consideration of his transfer to the coheirs of certain rights to other properties partitioned by another instrument.
[3] This was the percentage of initial production assigned. The percentage of overriding royalty was to increase to 25% when specified costs of drilling operations were recovered, and it was then to decrease to 12½% when two-thirds of the recoverable hydrocarbons had been removed from the reservoirs underlying the leased premises.
[4] That is, the total includes both the 60% originally received by Edward Boagni, Jr., who received Lot "G" in the partition, and also the 11% originally reserved by Vincent Boagni.
[5] In the proportions of 11% each to Susan Boagni Gardner and Alice Boagni Heard and of 7% to Richard O. Eckart, the percentages originally reserved by or granted to them.
[6] By the time of the leasing, Mr. Boagni no longer owned personally any interest affecting Lot "G". His efforts were directed to assist the then-owners of the 71% Edward-Vincent interest, including his widowed sister-in-law and her children, as well as his own wife and son.
[7] That is, the person holding the "executive rights", namely the exclusive leasing power over the minerals in a tract of land. See Williams and Meyers, Manual of Oil and Gas Terms, verbo "Executive rights", p. 89 (1957).
[8] See Williams and Meyers, cited above as footnote 7, "Non-participating royalty", p. 157: "An expense-free interest in oil and gas as if and when produced. The prefix `non-participating' indicates the interest does not share in bonus or rental, nor in the right to execute leases or to explore or develop * * *."
[9] State Nat. Bank of Corpus Christi v. Morgan, 135 Tex. 509, 143 S.W.2d 757 (1940), a view subsequently repudiated by the Texas Supreme Court: Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673 (1957); cf. Sykes v. Dillingham, Okl., 318 P.2d 416 (1957) (intent of parties).
[10] Griffith v. Taylor, 156 Tex. 1, 291 S.W. 2d 673 (1956); Patterson v. Texas Co., 131 F.2d 998 (5th Cir. 1942); Geller v. Smith, 130 Cal.App. 485, 20 P.2d 102 (1933); Carroll v. Bowen, 180 Okl. 215, 68 P.2d 773 (1937).
[11] Texas Co. v. Fontenot, 200 La. 753, 8 So.2d 689; Wright v. Brush, 115 F. 2d 265 (10th Cir. 1940); Sheppard v. Stanolind Oil & Gas Co., Tex.Civ.App., 125 S.W.2d 643 (1939).
[12] We might question this ruling, but it is unnecessary for us to pass upon it.