VINCENT BOAGNI, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4969–71. Filed February 28, 1973.

*John S. Dowling*, for the petitioner.
*A. A. Simpson, Jr.*, for the respondent.

#### OPINION

FEATHERSTON, *Judge:* Respondent determined a deficiency in the income tax of Vincent Boagni, Jr., for 1968 in the amount of $10,813.86. The only issue for decision is whether petitioner may deduct, under section 212,[1] legal fees incurred in two court proceedings, one a declaratory judgment action in which petitioner's title to an overriding royalty interest was placed in dispute and the other involving a claim to overriding royalty payments deposited in the registry of a local court.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

All the facts are stipulated and are found accordingly.

Petitioner was a legal resident of Laguna Beach, Calif., at the time he filed his petition. His Federal income tax return for 1968 was filed with the district director of internal revenue in New Orleans, La.

On the death of Edward M. Boagni on December 23, 1933, his four children became joint owners of certain real estate owned by him. On November 23, 1942, those coheirs, one of whom was petitioner's father, entered into a partition agreement whereby each acquired the surface title to designated tracts of land. Each coheir was also granted the right to 60 percent of the oil, gas, and other mineral royalties derived from production from his or her tract of land. The remaining 40 percent was granted or "reserved" as follows: 33 percent was to be divided equally among the three other coheirs, and 7 percent was to go to Richard O. Eckart in consideration of his transfer to the coheirs of certain rights to other properties partitioned by another instrument.

With regard to the mineral interests, the partition agreement further provided:

The royalty rights so reserved by the * * * [coheirs] in and to the lots allotted to the others, including the rights of Richard O. Eckart, shall be and remain an obligation attached to said lands binding on any owner or owners thereof or of the mineral rights therein or lessees operating thereon, * * * but the owner of the fee title to each of the said lots, as herein allotted, shall have the right to grant any lease or leases affecting his or her respective lands without the concurrence of the other royalty owners therein and any and all bonuses, rentals and other considerations (except royalties) paid for or in connection with any such lease or other contract shall be payable only to the owner of the lands so leased and the other parties as royalty owners shall not participate therein. It is further provided, however, that in the event any owner should grant a lease or leases affecting his or her land as herein allotted providing for the payment of royalties on oil, gas or other minerals in excess of one-eighth ($\frac{1}{8}$th) of the whole produced from said land then the other owners of the royalty rights therein reserved or transferred to them shall participate in such excess royalties in the same percentages herein set forth; and the total royalties in which said parties shall participate shall in no event be less than one-eighth ($\frac{1}{8}$th) of the whole of the oil, gas or other minerals produced from the land. * * *

Pursuant to the partition agreement, petitoner's uncle, Edward M. Boagni, Jr. (hereinafter Edward, Jr.), acquired a parcel of land designated as lot G in St. Landry Parish, La. Subsequently, petitioner's father (Vincent Boagni, Sr.) purchased the surface title and part of the mineral interest in lot G from Edward, Jr. As a result of this purchase, Edward, Jr., and Vincent Boagni, Sr., together (hereinafter the Edward-Vincent group), owned 71 percent of the mineral royalty interest in lot G. The remaining 29 percent was owned by petitioner's two aunts, Susan Boagni Gardner (11 percent) and Alice Boagni

Rozas (11 percent), and Richard O. Eckart (7 percent) (hereinafter the Susan-Alice group).

During 1958, petitioner, heir of Vincent Boagni, Sr., and representative of the Edward-Vincent group, began negotiations with Craft Thompson for the leasing of the mineral rights to lot G. During these negotiations, Thompson offered a cash bonus of $100 per acre (a total of $52,000) if the Edward-Vincent group would grant a mineral lease of lot G calling for a one-eighth royalty, the rate prevailing in the area of St. Landry Parish. However, petitioner and Thompson also considered a proposal that the Edward-Vincent group receive an overriding royalty interest in lieu of the cash bonus.

On December 13, 1958, the Edward-Vincent group executed a mineral lease of lot G to Thompson, containing a provision that the lessors, i.e., both the Edward-Vincent and the Susan-Alice groups, were to receive royalties equal to one-eight of all production. Simultaneously with execution of the lease, the lessee Thompson executed two separate instruments which assigned an overriding royalty interest to the members of the Edward-Vincent group in lieu of a cash bonus. The overriding royalty interest so assigned covered 20 percent of all mineral production to be obtained from lot G under the terms of the lease.

When production was obtained from wells located on lot G, members of the Susan-Alice group claimed rights to 29 percent of the overriding royalties, and the Edward-Vincent group disputed their claims. Two Louisiana State court suits followed. One was an action for declaratory judgment, brought by members of the Susan-Alice group, in which they prayed that each member be declared the owner of a fraction of the overriding royalty interest. The other was a concursus proceeding [2] brought by Whitehall Oil Co., Inc., the assignee of the mineral lease, in which the oil company sought directions for the disposition of oil proceeds deposited in the registry of the court.

The trial court sustained the Edward-Vincent group's position in both proceedings. It distinguished between a "lease royalty" and an "overriding royalty" and held that the Edward-Vincent group acquired the overriding royalty interest as consideration in lieu of a cash bonus. The intermediate appellate court reversed the trial court, *Gardner* v. *Boagni*, 197 So. 2d 671 (La. Ct. App. 1967), and *Whitehall Oil Co.* v. *Eckart*, 197 So. 2d 664 (La. Ct. App. 1967), but the Supreme Court of Louisiana reinstated the judgments of the trial court, *Gardner* v. *Boagni*, 252 La. 30, 209 So. 2d 11 (1968).

---

[2] La. Code Civ. Pro. Ann. art. 4651 (West 1961) describes a "concursus proceeding" as follows:

"A concursus proceeding is one in which two or more persons having competing or conflicting claims to money, property, or mortgages or privileges on property are impleaded and required to assert their respective claims contradictorily against all other parties to the proceeding."

The legal arguments advanced by the Edward-Vincent group and the Susan-Alice group were summarized by the Supreme Court of Louisiana (*Gardner* v. *Boagni*, 209 So. 2d at 14) in its opinion disposing of both the declaratory judgment and concursus suits as follows:

> The Edward-Vincent group contend that the overriding royalty was assigned to them in lieu of a cash bonus; and that, inasmuch as they were entitled under the agreement of partition to retain all bonuses, they were the owners of the entire proceeds therefrom. In this connection, they urge that a distinction should be made between overriding royalty, paid instead of a cash bonus, and the ordinary royalty as rental in connection with the lease.
>
> On the other hand the Susan-Alice group * * * urge that the override transferred by Thompson is merely an excess royalty payment within the contemplation of the "excess royalty" provision of the partition agreement. They urge that the "(except royalties)" stipulation, when read in connection with the "excess royalty" provision, means that however royalties are taken they should be shared, in the percentage stated, by all of the royalty owners. And they assert that, since their collective portions total 29%, they are the owners of that interest in the override and are entitled to the entire amount of the proceeds deposited in the registry of the court.

In 1968, petitioner paid $16,067.82 as his apportioned share of attorneys' fees in this litigation. On his 1968 income tax return, under the heading "Rent & Royalty Income," petitioner deducted the attorneys' fees from the overriding royalties received as a result of the litigation. Respondent disallowed the entire deduction and in the notice of deficiency gave the following explanation: "It is determined that the amount of $16,067.82 deducted on your return as attorney fees in connection with your royalty income represents a capital expenditure under section 263 of the Internal Revenue Code."

Decision of the issue presented by these facts requires a reconciliation of section 212 [3] with the well-established rule that expenses which are capital in nature are nondeductible. Section 212 allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income." Section 263(a),[4] on the other hand, denies a deduction for "permanent improvements or betterments made to increase the value of any property or estate." By Income Tax Regs. sec-

---

[3] SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

    (1) for the production or collection of income;

    (2) for the management, conservation, or maintenance of property held for the production of income; * * *

[4] SEC. 263. CAPITAL EXPENDITURES.

    (a) GENERAL RULE.—No deduction shall be allowed for—

    (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

tion 1.263(a)–2(c) and corresponding prior regulations, this provision has been interpreted for many years to require the capitalization of the "cost of defending or perfecting title to property."

Prior to the adoption of the statutory language now appearing in the Code as section 212, a taxpayer, in order to qualify for the deduction of an ordinary and necessary expense, was required to show that the expense was incurred in "carrying on any trade or business" within the meaning of the predecessor of section 162(a). The result was that "nontrade or nonbusiness expenses * * * [were] not deductible, although nontrade or nonbusiness income * * * [was] fully subject to tax." H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 410. The provisions of section 212 were designed to correct this inequity by enlarging the categories of income with reference to which expenses are deductible. *Trust of Bingham* v. *Commissioner*, 325 U.S. 365, 374 (1945). This was not done by creating new types of deductible expenses but, rather, by making the old deductions applicable to additional income-producing activities. *United States* v. *Gilmore*, 372 U.S. 39, 44–45 (1963). In *Petschek* v. *United States*, 335 F. 2d 734, 736 (C.A. 2, 1964), the court explained that section 212 provides for deductions "coextensive with the business deductions" allowed by section 162 in those "pecuniarily motivated" or "profit-seeking" activities which are neither the conduct of a taxpayer's "trade or business" on the one hand nor the mere satisfaction of "his needs as a human" [5] on the other.

Yet section 212 was not intended to alter the rule that capital expenditures—including costs incurred in the acquisition or disposition of assets—are not deductible but are to be added to the taxpayer's basis in the property. "The non-deductibility of capital expenditures, founded upon the principle that related disbursements and receipts should be given consistent tax treatment, is * * * a basic limitation upon * * * [section 212]." *Spangler* v. *Commissioner*, 323 F. 2d 913, 918 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. This capital expenditure limitation on deductions depends upon the construction given the word "expenses" in sections 162(a) and 212, as well as the language of section 263. See 1 Surrey, Warren, McDaniel, & Ault, Federal Income Taxation 349 (1972 ed.) ; *Spangler* v. *Commissioner, supra* at 918, 919. In the words of the Supreme Court, "section 263 does not provide a complete list of nondeductible expenditures." *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U.S. 345, 358 (1971).

The line of demarcation between currently deductible and capital expenditures is often a shadowy one, and the courts have long strug-

---

[5] Personal, living, and family expenses are declared to be nondeductible by sec. 262. This declaration, of course, applies to litigation expenses falling within these described categories. *United States* v. *Gilmore*, 372 U.S. 39, 43–44 (1963).

gled with the problem of devising standards for characterizing the costs of litigation.[6] In its two most recent opinions on the subject, *Woodward* v. *Commissioner*, 397 U.S. 572 (1970), and *United States* v. *Hilton Hotels*, 397 U.S. 580 (1970), the Supreme Court enunciated the rule that in cases where the litigation involved the acquisition or disposition of capital assets, the origin and character of the claim, rather than the taxpayer's primary purpose in litigating the claim, are the controlling criteria in deciding whether the expenditure should be capitalized. This Court has extended the same rule to cases involving the defense or perfection of title to property. *Stass Reed*, 55 T.C. 32, 39-41 (1970).

Quite plainly, the "origin-of-the-claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation [7] but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. See *United States* v. *Gilmore, supra* at 47-48; cf. *Kornhauser* v. *United States*, 276 U.S. 145 (1928) ; and *Deputy* v. *du Pont*, 308 U.S. 488, 496 (1940). Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy. *Morgan's Estate* v. *Commissioner*, 332 F. 2d 144,151 (C.A. 5, 1964).

Situations arise where the litigation is rooted, in part, in the defense or perfection of title (nondeductible) and, in part, in the collection of income or for the management of property (deductible). In these circumstances, section 1.212-1(k), Income Tax Regs., contemplates that an allocation should be made as follows:

Expenses paid or incurred in defending or perfecting title to property, [or] in recovering property (other than investment property and *amounts of income*

---

[6] The Supreme Court decisions dealing with the deductibility of litigation expenses include *Kornhauser* v. *United States*, 276 U.S. 145 (1928) ; *Lykes* v. *United States*, 343 U.S. 118 (1952) ; *United States* v. *Gilmore, supra; Woodward* v. *Commissioner*, 397 U.S. 572 (1970) ; and *United States* v. *Hilton Hotels*, 397 U.S. 580 (1970).

[7] In Justice Jackson's dissent, joined by Justice Frankfurter, in *Lykes* v. *United States, supra* at 128, is the following discussion of the origin-of-the-claim doctrine :

"Of course one can reason, as my brethren do, that if there had been no gifts there would have been no tax, if there had been no tax there would have been no deficiency, if there were no deficiency there would have been no contest, if there were no contest there would have been no expense. And so the gifts caused the expense. The fallacy of such logic is that it would be just as possible to employ it to prove that the lawyer's fees were caused by having children. If there had been no children there would have been no gift, and if no gift no tax, and if no tax no deficiency, and if no deficiency no contest, and if no contest no expense. Hence, the lawyer's fee was not due to the contest at all but was a part of the cost of having babies. If this reasoning were presented by a taxpayer to avoid a tax, what would we say of it? So treacherous is this kind of reasoning that in most fields the law rests its conclusion only on proximate cause and declines to follow the winding trail of remote and multiple causations."

*which, if and when recovered, must be included in gross income*), * * * constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, *that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents.* * * *
[Emphasis added.]

The principles underlying this regulation have been applied in a variety of factual situations. In *Spangler* v. *Commissioner, supra* at 915, 919–920, for example, an allocation of disputed legal expenses was made where the litigation involved the taxpayer's title to stock as well as his right to accumulated dividends; a deduction for the portion of the expenses allocable to the title controversy was disallowed, and a deduction for the portion allocable to the dividends was allowed. Cf. *DeMink* v. *United States*, 448 F. 2d 867, 869 (C.A. 9, 1971). Similarly, in *Daniel S. W. Kelly*, 23 T.C. 682, 688–689 (1955), affd. 228 F. 2d 512 (C.A. 7, 1956), a deduction was denied for the portion of the legal expenses attributable to the perfection of title to rental property but allowed for the portion allocable to the recovery of related interest and rental income. More pertinent, in *Estate of Joseph P. Morgan*, 37 T.C. 31, 38 (1961), affirmed on this issue and remanded on the issue as to the amount of the allocation 332 F. 2d 144, 151 (C.A. 5, 1964), and *Estate of Thomas E. Arnett*, 31 T.C. 320, 335 (1958), acq. 1959–1 C.B. 3, deductions were denied for the legal expenses allocable to the defense and perfection of title to oil property and were allowed for the expenses attributable to oil royalties derived from the property. See also *William A. Falls*, 7 T.C. 66, 72 (1946) (allocation of legal expenses for defending title to patents and for collection of royalties thereon).

We think an allocation must be made in this case. The legal fees in controversy covered both suits, the concursus proceeding initiated by Whitehall Oil Co., Inc., and the declaratory judgment action brought by the Susan-Alice group. In the concursus proceeding, the oil company sought directions as to how it should dispose of the disputed 29 percent of the overriding royalties claimed by both the Susan-Alice group and the Edward-Vincent group. Members of both groups were joined as defendants. This suit was a contest between the two groups over the ownership of these accumulated royalties. Whoever recovered this fund wound be required, in the words of the above-quoted regulations section 1.212–1(k), to include it in gross income.

While the outcome of the concursus proceeding, in a sense, depended upon the title of the respective parties to the overriding royalty interests, almost every contest over income derived from real property has a question of title lurking in the background. See *Usry* v. *Price*, 325 F. 2d 657, 659 (C.A. 5, 1963). In this phase of the litigation, petitioner was concerned with the collection of the accumulated royalties,

comparable in character to the accrued rents referred to in regulations section 1.212–1(k), quoted above. The fund in the registry of the court, which he sought to recover, was not a capital asset; rather, it represented income derived from a capital asset. *Warren* v. *United States*, 145 Ct. Cl. 571, 171 F. Supp. 846, 848–849 (1959), certiorari denied 361 U.S. 916 (1959). Had petitioner defaulted in the concursus proceeding, he might not have collected any of this royalty income even though he ultimately prevailed in the declaratory judgment action. We think section 212 allows a deduction for the expenses allocable to his recovery of this ordinary income.

In the declaratory judgment suit, however, the members of the Susan-Alice group sought a declaration of their rights under the partition agreement, the mineral lease, and the overriding royalty assignments. The nature and character of this proceeding was a test of petitioner's title to the overriding royalty interest: whether the Edward-Vincent group owned 100 percent or 71 percent of that interest. The cloud on petitioner's title to 29 percent of the overriding royalty interest was traceable to the ambiguous use of the terms "royalty" and "excess royalty" in the partition agreement when read in the light of the lease and the overriding royalty assignments. The litigation removed that cloud on petitioner's title to the overriding royalty interest as such, completing his acquisition of a valuable capital asset which he could sell and realize capital gain, see Rev. Rul. 55–526, 1955–2 C.B. 574, or could retain for the income which it would produce. "It is a rule virtually as old as the federal income tax itself that costs incurred in defending or perfecting [a] taxpayer's claim to ownership of capital assets are capital expenditures, and not expenses deductible from ordinary income." *Spangler* v. *Commissioner*, 323 F. 2d at 919.

The record does not provide a fully satisfactory formula for allocating the legal expenses between the two proceedings. However, two separate and distinct suits were instituted, and two separate judgments were entered in the trial court. Moreover, two separate opinions were issued by the intermediate appellate court. Although the proceedings were consolidated and a single opinion was entered by the Louisiana Supreme Court, the opinion shows that it disposed of both cases. In view of these facts, the best that could be done, in any event, in the way of an allocation formula would be a "rough approximation." *DeMink* v. *United States, supra* at 869–870; see also *Estate of Thomas E. Arnett, supra* at 335.

In the light of all the evidence, we hold that one-half of the disputed legal expenses is deductible and the other half must be capitalized. To reflect this holding,

*Decision will be entered under Rule 50.*