ESTATE OF HERBERT J. BLOCK, DECEASED, BONNIE M. BLOCK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Block v. Commissioner
Docket No. 44192-86.
United States Tax Court
T.C. Memo 1988-159; 1988 Tax Ct. Memo LEXIS 190; 55 T.C.M. (CCH) 614; T.C.M. (RIA) 88159; April 18, 1988. Robert G. Dykes, for the petitioner. Nancy B. Herbert, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge:[1] Respondent determined a deficiency in petitioner's Federal income tax and additions to tax as follows: Year
Additions to Tax
Ended
Deficiency
Sec. 6653(a)(1) [2]
Sec. 6653(a)(2)
Sec. 6661
11/30/83
$ 106,086
$ 5,304
*
$ 10,609
*191 After concessions, [3] the sole issue for decision is whether petitioner is entitled to a deduction for $ 231,894 of legal fees or whether that amount is instead a capital expenditure. FINDINGS OF FACT This case was submitted for decision on fully stipulated facts pursuant to Rule 122. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner is the estate of Herbert J. Block. Its address was in Columbus, Ohio, when its petition was filed. Herbert J. Block ("Herbert") and his brother Macy T. Block ("Macy") were the owners of an Ohio corporation named Sun Television and Appliances, Inc. ("Sun Corp."). *192 Prior to December 11, 1978, they each owned 5,000 of its nonvoting common shares and 500 of its voting common shares. Buy-Sell Agreement
On December 11, 1978, Herbert, Macy, and Sun Corp. entered into a buy-sell agreement (the "Buy-Sell Agreement") with respect to their shares. The Buy-Sell Agreement contained two options that are relevant here. First, the Buy-Sell Agreement granted Sun Corp. an exclusive option for 60 months following the death of either Herbert or Macy to purchase the Sun Corp. stock owned by the deceased shareholder (the "call option"). Second, the agreement granted the executors of a deceased shareholder a one-year option following the shareholder's death to sell to sun Corp. "so many shares of his stock as do not exceed in value the amount of any life insurance payable to [Sun Corp.] by reason of the death of the deceased shareholder" (the "put option"). The agreement specified that the price at which stock would change hands under either of the options was to be determined by dividing the value of Sun Corp. by the total number of shares of voting and nonvoting stock issued and outstanding. Herbert and Macy agreed that the value of Sun Corp. *193 was $ 7,000,000 as of February 28, 1978. The Buy-Sell Agreement provided that Herbert and Macy could increase or decrease the $ 7,000,000 valuation annually by agreement and that, if they failed to agree, the valuation would adjust automatically to reflect life insurance proceeds received by Sun Corp. upon their deaths, amounts paid by Sun Corp. in redemption of its shares, and after-tax profits and losses of Sun Corp. Herbert's Will
Herbert executed a will on February 9, 1979. The will appointed Macy and Herbert's wife Bonnie as the executors of his estate and granted Macy "sole responsibility for all matters (including retention or disposition) pertaining to any business enterprise or investment property (excluding listed securities)" in which Herbert had an ownership interest at his death. The will provided that the bulk of petitioner's property, including his Sun Corp. shares, was to be transferred to a bank subject to the terms of a trust instrument (the "Trust Instrument"). The Trust Instrument provided for a marital trust for the benefit of Bonnie and her estate, and a residuary trust for the benefit of Herbert's children and Bonnie. The Trust Instrument named *194 Macy a special trustee with "sole responsibility for all matters (including retention or disposition) pertaining to any business enterprise or investment property (excluding listed securities)" in which Herbert had an ownership interest at his death. Herbert died on May 22, 1981, and his will was filed for probate on June 16, 1981. Richard Oman and John Dunkel, both partners of a Columbus, Ohio law firm, were attorneys of record for both Bonnie and Macy as coexecutors, and also represented Sun Corp. Negotiations By Macy
After Herbert's death, Macy began to negotiate the sale of Sun Corp. to third parties. By October 1, 1981, negotiations had progressed to a point where the attorney for the third parties had submitted a draft stock purchase agreement. On February 4, 1982, Macy and his attorney, John Dunkel, met with the third parties. By the conclusion of the meeting it had been tentatively agreed that the sales price of all of Sun Corp.'s stock would be $ 1,250,000 more than Sun Corp.'s book value, or approximately $ 14,800,000. On February 19, 1982, Dunkel wrote the attorney representing the third parties and enclosed a revised stock purchase agreement. The correspondence *195 proposed that the book value of Sun Corp. for purposes of computing the price for the sale would be established as of February 28, 1982, and that the closing of the sale would take place on March 31, 1982. Sale By Petitioner
On February 15, 1982, Bonnie and Macy signed an agreement exercising the put option granted them by the Buy-Sell Agreement to sell Sun Corp. shares owned by petitioner to Sun Corp. The agreement provided that petitioner would sell 514.1119 nonvoting shares to Sun Corp. for a total purchase price of $ 557,179. That amount equaled the life insurance proceeds received by Sun Corp. when Herbert died. Estate Tax Return
On February 16, 1982, Macy and Bonnie met with attorneys from Dunkel's firm to discuss the Federal estate tax return for Herbert's estate. Although Macy's negotiations to sell Sun Corp.'s shares had indicated that the value of the Sun Corp. shares held by the estate was approximately $ 7,400,000 (one-half of the $ 14,800,000 approximate tentative sales price), the attorneys told Macy and Bonnie that the value of petitioner's Sun Corp. stock for Federal estate tax purposes was $ 3,764,845. The attorneys explained that the terms of *196 the Buy-Sell Agreement determined the value of the stock for Federal estate tax purposes. Pursuant to the Buy-Sell Agreement, the basic purchase price for the estate's Sun Corp. shares as of the date of Herbert's death was $ 5,960,193. Fifteen percent of that amount was to be paid in cash either at or before closing. One-third of the remaining principal was to be paid in 20 equal semiannual installments which were to include interest on the unpaid principal balance at the annual rate of six percent. The remaining two-thirds of the principal was to be paid with the 20th payment. The attorneys had determined that $ 3,764,845 was the present value of the payments. Bonnie contended in subsequent litigation against Macy that Macy had learned for the first time at the February 16, 1982, meeting that his true cost, in present value terms, of acquiring petitioner's shares of Sun Corp. was only $ 3,764,845. Exercise of Option
On February 20, 1982, Macy informed the chief financial officer and secretary of Sun Corp. that Sun Corp. was not going to be sold to third parties. On February 25, 1982, Macy notified Bonnie on behalf of Sun Corp. that Sun Corp. was exercising its option *197 under the Buy-Sell Agreement to purchase all of the sun Corp. shares then held by petitioner. Macy believed then that Sun Corp. would have profits of approximately $ 2,000,000 for the February 28, 1982 fiscal year. In fact, Sun Corp. had after-tax profits for the fiscal year of $ 2,318,000. If Sun Corp. had been permitted to exercise its option to purchase petitioner's shares on February 25, 1982, the terms of the Buy-Sell Agreement would not have required those profits to be taken into account in calculating the purchase price of the shares. Legal Action
Macy's decision to exercise Sun Corp.'s option to purchase petitioner's shares prompted Bonnie to seek legal advice. On or about July 12, 1982, Bonnie retained a Cleveland, Ohio, law firm to represent her, individually and as coexecutor. The Cleveland firm investigated numerous legal theories against Macy including, among others, fiduciary self-dealing, personal use by a fiduciary of inside information, and other breaches of fiduciary duty. On or about November 2, 1982, Bonnie retained a Columbus, Ohio, law firm to represent her, individually and as coexecutor, as local cocounsel. The Columbus firm investigated numerous *198 legal theories against Macy and Sun Corp. including, among others, fiduciary responsibility, and majority shareholder duty to minority shareholders. On November 23, 1982, Bonnie's attorneys filed a complaint in an Ohio state court against Macy and Sun Corp. The complaint alleged that Macy had breached his fiduciary duty to petitioner by (1) causing petitioner to sell shares to Sun Corp. pursuant to the put option when it did, (2) purporting to exercise Sun Corp.'s call option to purchase petitioner's shares when he did, and (3) canceling the planned sale of Sun Corp. to third parties. The relief requested in the complaint was: (1) either increased compensation for, or a return of some of, the shares that petitioner had sold to sun corp. pursuant to the put option; (2) judgment in favor of petitioner in the amount of the present value of the Sun corp. stock it held or, alternatively, a determination that Sun Corp.'s call option had been ineffectively exercised; (3) judgment in favor of petitioner in the approximate amount of $ 7,500,000 (the approximate amount that third parties had tentatively agreed to pay for petitioner's Sun Corp. shares) plus interest; and (4) judgment in favor *199 of Bonnie for death benefits that she lost when Sun Corp.'s option to purchase petitioner's shares was purportedly exercised. On December 15, 1982, Bonnie filed a memorandum in opposition to an application by Macy for approval of Sun Corp.'s exercise of its purchase option under the Buy-Sell Agreement. Settlement
The parties to the litigation reached a settlement on April 4, 1983. [4] The settlement agreement provided that Bonnie approved the sale to Sun Corp. of all 499.5 voting and 5,000 nonvoting Sun Corp. shares that Herbert owned individually when he died on terms that were more favorable to petitioner than the terms of the option granted Sun Corp. by the Buy-Sell Agreement. [5] The settlement agreement also resolved a nubmer of other matters between Bonnie and Macy. [6]
*200 Petitioner paid all of the legal fees incurred in connection with the dispute with Macy and Sun Corp. It deducted the fees, which totaled $ 238,642.98, on its Federal income tax return for its year ended November 30, 1983. Respondent disallowed $ 231,894 of the deduction, and included that amount in the basis of petitioner's Sun Corp. shares. OPINION The issue for decision is whether the legal fees disallowed by respondent are deductible under section 212, [7] as petitioner contends, or whether the fees must be capitalized under section 263, [8] as respondent determined. *201 Respondent's position is that the fees at issue constitute capital expenses incurred in connection with the disposition of the sun Corp. stock held by petitioner. Petitioner's position is that the fees at issue constitute ordinary and necessary expenses incurred in the administration of an estate. [9]Petitioner bears the burden of proving that the fees at issue are deductible. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Whether the legal fees at issue are properly *202 deductible by petitioner depends on the origin and character of the claim with respect to which the fees were incurred. United States v. Gilmore,372 U.S. 39, 49 (1963); Boagni v. Commissioner,59 T.C. 708, 713 (1973). If the origin and nature of the claim involves the acquisition or disposition of a capital asset or ther defense or protection of title, the legal fees are nondeductible capital expenditures. Brown v. United States,526 F.2d 135, 138-139 (6th Cir. 1974); Boagni v. Commissioner, supra at 713. The origin of a claim is a question of fact. As we stated in Boagni v. Commissioner, supra:
The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertinent to the controversy. [59 T.C. at 713; citations *203 and fn. ref. omitted.] We have carefully reviewed the stipulated facts and the many exhibits contained in the record. the convince us that the origin and character of the claim with respect to which the legal fees at issue were incurred was rooted in a dispute over the amount petitioner was to receive for its stock. The fact that Bonnie sought legal advice only after the purported exercise of Sun Corp.'s option to purchase petitioner's shares, the remedies sought in her complaint, and the settlement terms that she ultimately agreed to, all indicate that the litigation was over the price petitioner would receive for the stock. There is no dispute that the stock was a capital asset in the hands of petitioner. Legal fees incurred to establish the price for which a capital asset is to be sold are capital expenses. United States v. Hilton Hotels Cor.,397 U.S. 580, 583-584 (1970); Estate of Baier v. Commissioner,533 F.2d 117, 119 n. 2 (3d Cir. 1976), affg. 63 T.C. 513 (1975); Wagner v. Commissioner,78 T.C. 910, 915 (1982). *204 The Supreme Court recognized in United States v. Hilton Hotels Corp., supra, that the act of fixing the price at which a capital asset will change hands is an integral part of the process of disposing of the asset, hence a capital expense. although the record indicates that a minor portion of the legal fees paid by petitioner may have been incurred in connection with issues other than the sale of petitioner's Sun Corp. stock, and that some of those fees may be deductible, the record contains little evidence that would allow us to determine the amount of the fees that are properly deductible. We are unconvinced that the amount of the fees that are properly deductible exceeds the amount of the fees that are properly deductible exceeds the amount allowed by respondent. Petitioner argues strenuously that the fees at issue were incurred as part of the process of administering an estate, and that they are therefore deductible under section 212. Petitioner's argument fails to give adequate recognition to the fact that, *205 pursuant to sections 161 and 261, expenses that would otherwise be deductible under section 212 are nevertheless not deductible if they are capital expenses under section 263. Estate of Baier v. Commissioner, supra;Wagner v. Commissioner, supra.We have already concluded that petitioner has failed to disprove respondent's determination that the fees at issue are capital expenses under section 263. The fees are accordingly not deductible regardless of whether they would otherwise be deductible under Section 212. To reflect the foregoing, Decision will be entered for the respondent as to the deficiency and for the petitioner with respect to the additions to tax.
Footnotes
1. By order of the Chief Judge, this case was reassigned to Judge Jules G. Korner III↩ for opinion and decision. 2. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
*. 50 percent of the interest due on an underpayment of $ 106,086. ↩
3. Petitioner conceded a $ 1,395 increase in its taxable income, and respondent conceded that no additions to tax apply. ↩
4. The parties stipulated that the litigation was settled on April 14, 1983. Exhibits stipulated into evidence, including the settlement agreement itself, establish that the settlement took place on April 4, 1983. ↩
5. The settlement agreement provided that the basic purchase price for petitioner's Sun Corp. shares was $ 6,840,962. Petitioner had already received $ 557,179 of the amount pursuant to its exercise of the put option, and was to receive another $ 1,000,000 cash at closing. The balance of $ 5,283,783 was payable over ten years. A total of $ 3,837,780 of the balance was payable in 20 equal semiannual installments which were to include interest on the unpaid principal balance at the annual rate of six percent. The remaining $ 1,446,003 principal amount was due on the tenth anniversary of the date of closing. ↩
6. The other matters included a dissolution of block Realty, an Ohio general partnership, in which petitioner's half interest was valued, at the date of death, in the amount of $ 844,538.40; the allocation and maintenance of B.B. Land Co., an Ohio general partnership, in which petitioner's interest was valued, at the date of death, in the amount of $ 112,734.38; and a division of all other properties. In addition, Macy agreed to resign as coexecutor, to waive his rights to any commissions as coexecutor, and to resign as special trustee under the Trust Agreement. ↩
7. Sec. 212 provides as follows: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. ↩
8. Sec. 263 provides in relevant part as follows: (a) General Rule. -- No deduction shall be allowed for -- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * ↩
9. Sec. 1.212-1(i), Income Tax Regs., provides in relevant part that "reasonable amounts paid or incurred by the fiduciary of an estate or trust on account of administration expenses, including fiduciaries' fees and expenses of litigation, which are ordinary and necessary in connection with the performance of the duties of administration are deductible under section 212↩ * * *."