**E. W. BROWN, Jr. and Gladys Slade Brown, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 14640.**

United States Court of Appeals
Fifth Circuit.

Sept. 22, 1954.

L. J. Benckenstein and Peter B. Wells, Beaumont, Tex., for petitioners.

S. Dee Hanson, Ellis N. Slack, Lee A. Jackson and Meyer Rothwacks, Sp. Assts. to Atty. Gen., Dept. of Justice, Kenneth W. Gemmill, Acting Chief Counsel, and William D. Crampton, Sp. Atty. Bureau of Int. Rev., and H. Brian Holland, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is a petition to review the decisions of the Tax Court in four consolidated cases involving deficiencies assessed against petitioners for the years 1945 and 1946. Petitioners are husband and wife who filed separate returns for those years under the Texas community property laws.

Dr. E. W. Brown and his wife, Carrie L. Brown, accumulated considerable community property consisting of commercial and residential properties in Texas and Louisiana. Upon his death in 1917, Dr. Brown devised his interest in the community to his three children, E. W. Brown, Jr., (one of the petitioners here),

H. L. Brown and Mrs. Fannie Brown Moore. He requested that his estate remain intact for ten years. The following year, Mrs. Moore died intestate, survived by her husband and a daughter, Babette Moore (later married to E. R. Odom). By mutual consent of all parties, the estate of Dr. Brown was left undivided, being operated primarily by his widow and two sons.

In addition to her interest in the property of the former community, Mrs. Carrie Brown owned a large separate estate, including properties in Texas and Louisiana. In actual operation, the business connected with her own properties was intermingled with that of the former community, and she was considered to be in control of all properties. In 1923 and 1924, she financed the organization of Brown Paper Mill, Incorporated, a large pulp and paper manufacturing firm located at Monroe, Louisiana, and she remained an active officer in that company until her death in 1941, participating in its many transactions as such. She also remained very active in the management and operation of all her other properties.

In 1931, Mrs. Brown executed her will, wherein she devised her property in the proportions of three-sevenths to each of her two sons and one-seventh to Babette Moore Odom, her granddaughter. On several occasions beginning in 1932 she made gifts of certain property to her sons, particularly several in December, 1934, of cash and Brown Paper Mill stock aggregating nearly $3,000,000.

A short time after her death, her will was admitted to probate, with the properties of her estate being valued for the purpose of Federal estate taxation in excess of $5,000,000. The property was kept intact and operated in connection with the administration of her estate by her two sons, testamentary co-executors. In March, 1945, the Federal estate tax was finally concluded and paid; during the same month, inheritance taxes were paid to the State of Texas. Inheritance taxes to the State of Louisiana were actually paid in May, 1945, but liability for Louisiana taxes was not definitely concluded until the entry of a judgment on May 6, 1946. Upon payment of these sums, the executors and the owners of all rights in the property formerly comprising the community between Dr. Brown and Mrs. Carrie Brown commenced a partition thereof.

In August, 1945, E. W. Brown, Jr., and H. L. Brown received a letter from Babette Odom, addressed to them as co-executors of Mrs. Carrie Brown's estate. In the letter Mrs. Odom questioned the capacity of her grandmother to make the will of 1931 and the gifts in 1932 and subsequently, particularly the large gifts in December, 1934. She requested her uncles as co-executors to cause themselves in their individual capacities to make restoration to the estate of the gifts or the value thereof.

The brothers employed attorneys to investigate and advise them as to the merits and effect of these contentions; and they were advised that while it was the opinion there was no merit in fact or law in the claims, disastrous consequences would result if such a cloud were cast upon the multitude of transactions in which their mother had participated, by the publication of the Odom contentions through suit or otherwise. Consequently, they were advised to attempt full settlement of the controversy.

With the assistance of their attorneys, the brothers effected a settlement with Mrs. Odom, evidenced by a lengthy and detailed agreement. By its provisions, Mrs. Odom was required to relinquish all claims over and above the legacy left her by her grandmother and to agree never to institute suit questioning the validity of any of the transactions in which her grandmother participated—in consideration for which the brothers paid her more than $300,000 out of their portions of the estate. Further, the brothers agreed not to charge the estate executors' fees and to pay their attorney's fees and other legal expenses out of their portions of the estate. There was also included their agreement to buy Mrs. Odom's Brown Paper Mill stock at a stated price per share; and finally the

settlement required a full partition of the estate properties.

The executors maintained an office for the supervision and administration of the estate and employed accountants and others to keep and audit the records pertaining to the estate. The estate was operated as such during 1946; and no final report or account was filed by the executors during that year. Neither were the executors discharged by the beneficiaries or by the court in 1946.

On their separate returns for 1945, petitioners deducted the attorney's fees and other legal expenses paid by E. W. Brown, Jr., in connection with the Odom claims and settlement. The Commissioner disallowed the deduction, and also attributed to the taxpayers individually their proportionate share of the estate income for the year 1946. The Tax Court upheld the Commissioner on both points, ruling (1) that the legal expenses were incurred and paid to perfect or defend title to the properties and were therefore capital expenditures not deductible under Section 23(a) (2) of the Internal Revenue Code;[1] and (2) that the estate should have been terminated, and was for tax purposes, in 1945 when all necessary administrative duties had been performed.

Petitioners, of course, contend that the Tax Court's decision was clearly erroneous on both points, arguing (1) that the legal expenditures were made in the operation, management and conservation of income-producing property[2] and therefore deductible under the quoted statute; and (2) that it was inconsistent with the evidence and therefore arbitrary to find that the estate was terminated in 1945.

### Legal Expenses.

This problem has been considered in many cases, too numerous to cite, each being decided on its facts; and we have found none involving the precise situation presented here. Whatever else may be gleaned from a study of the cases, it is certain that there is no hard and fast rule by which it can easily be determined whether such expenditures are or are not deductible. In each such case, the court must examine the circumstances which gave rise to the expenditure; and the difficulty encountered in reaching the solution is readily seen from the opinions and the dissents handed down in the reported cases.

Of course, when property is held for the production of income, any expenditure which relates to the perfection or defense of the taxpayer's title to the property can, in one sense, be said to have been an expenditure for the *conservation* of the property. On the other hand, it seems equally as sound to say that any such expenditure is more properly an element in the cost of acquiring or preserving the legal right to the income produced by the property, and therefore must be considered a capital expenditure. Hence, it may be that we are confronted with what Justice Frankfurter calls "dialetic conflicts."[3] But we think that the proper solution lies in the approach indicated by the Tax Court in the instant case when it said:

"True, [a successful suit by Mrs. Odom] would have deprived peti-

---

1. "In computing net income there shall be allowed as deductions:

   (a) Expenses

   \*    \*    \*    \*    \*

   (2) *Non-trade or non-business expenses.* In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income." 26 U.S.C.A. § 23 (a) (2).

2. It was stipulated that virtually all of the estate of properties were income-producing, and that petitioner E. W. Brown, Jr., held his interest therein for investment and for the production of income.

3. Concurring opinion in Trust of Bingham v. Commissioner of Internal Revenue, 325 U.S. 365 at page 378, 65 S.Ct. 1232, 89 L.Ed. 1670.

tioner of income from the properties, but *such income is once removed in propinquity* from the fundamental and basic fact, i. e., that petitioner would have lost whatever title he then had or claimed either under the will or the gifts." (Emphasis supplied.)

As we interpret their argument, petitioners contend that the controversy between Mrs. Odom and her uncles never reached the point of being a direct attack upon their title to the property and that the legal expenses were incurred simply to protect income-producing transactions from the publication of unfounded claims. As illustrative of their view, petitioners point to the provisions of the agreement not involving title to the properties transferred to the brothers by the will and the gifts.

The completed agreement did in fact contain provisions for the distribution of the estate as a whole, for the sale of Mrs. Odom's Brown Paper Mill stock to her uncles and for the partition of all of the properties held in indivision; and it is apparent that these provisions in themselves did not relate directly to the question of petitioners' title to any of their property. Nevertheless, we think that the agreement as a whole clearly shows that all provisions were included for the purpose of removing forever the cloud cast upon the title to the properties by Mrs. Odom's contentions. Further, the additional provisions are so worded and so inter-related with the principal cause of the agreement that it clearly appears they were incorporated in order to obtain Mrs. Odom's assent and to terminate the discord arising from her claims to the property transferred to her uncles.

In petitioners' own brief, while discussing the controversy and their reasons for incurring the legal expenses, they say: "Under such circumstances anyone experienced in the ordinary affairs of business would have recognized that if pressed and translated into litigation, Mrs. Odom's threats and demands would *becloud the titles* to the properties acquired from Mrs. Brown, *imperil the validity* of all transactions in which she had participated, and jeopardize the revenue and income therefrom." (Emphasis supplied.) We think this indicates that the expenses were incurred to defend or perfect *title* to the properties—the elements of ownership which entitled the brothers to the income; and it is immaterial to the issue presented that no suit was ever entered. It is significant that the validity of the will and the gifts was sufficiently clouded to justify a detailed compromise embodying substantial payments and concessions to Mrs. Odom. Hence we hold that the expenses were capital expenditures not deductible under Section 23(a)(2). The cases relied upon by petitioners are readily distinguishable on their facts.[4]

Alternatively, petitioners argue that the Tax Court erred in not allocating some portion of the legal expenses to the management, conservation and maintenance of the properties and in not allowing deduction of the portion so allocated, citing William A. Falls, 7 T.C. 66. We agree that the reason given by the Tax Court[5] for not making such an allocation is hardly tenable; but we cannot agree that petitioners have established their right to any such allocation. As we have said, the payments were capital expenditures because they related to the

4. Trust of Bingham v. Commissioner of Internal Revenue, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670; Allen v. Selig, 5 Cir., 200 F.2d 487; Baer v. Commissioner of Internal Revenue, 8 Cir., 196 F.2d 646; Hochschild v. Commissioner of Internal Revenue, 2 Cir., 161 F.2d 817; Rassenfoss v. Commissioner of Internal Revenue, 7 Cir., 158 F.2d 764; Heller v. Commissioner of Internal Revenue, 9 Cir., 147 F.2d 376.

5. " * * * it must be rejoined that the record contains no data which could be used as a guide or basis in such an allocation. To do so would be purely arbitrary and speculative. In fact, we may properly observe that such proof may be extremely difficult, perhaps impossible."

defense or perfection of title; and there is nothing in the record to show that any of the expenditures were made for any other purpose. If all of the payments were capital expenditures, no portion can also be called expenditures for the management, conservation or maintenance of property. In the Falls case, the Tax Court first made the finding that a portion of the expenses were for the conservation of income. Therefore, the case does not support the argument advanced by petitioners.

### Termination of the Estate.

Section 161(a) (3) of the Code [6] provides for taxation of the income to the estates of deceased persons "during the period of administration or settlement of the estate". Treasury Regulation 111, Section 29.162–1 [7] defined the period of administration as "the period required by the executor or administrator to perform the ordinary duties pertaining to administration, in particular the *collection of assets* and *the payment of debts and legacies.*" (Emphasis supplied.)

In the instant case, the estate was so large, the properties so varied and the ownership so intermingled that it is virtually impossible to make a reasonable distinction between the management of the properties and the administration of the estate. The Commissioner does not dispute that the administration was properly continued through 1945, since it was not until that year that taxes were finally calculated and paid. Yet, it is stipulated that the judgment finally concluding liability for Louisiana taxes was not obtained until May 6, 1946; and that fact must be taken into consideration.

Further, as we have said, the Odom dispute involved the question of whether or not a large amount of property was owned by the estate or by the brothers individually. While the settlement of the dispute rendered unlikely the restoration of such property to the estate, it would irrevocably remove that possibility only if carried out in full. An integral part of the settlement agreement was the requirement that the properties be partitioned; and it may well have been that failure of the parties to comply with all the provisions of the agreement could have affected the status of the estate. We therefore hold that it was not unreasonable to continue the administration in conjunction with the efforts to partition; indeed, it seems to us that wisdom dictated such a course. It follows that the Tax Court erred when it held that all necessary administrative functions had been performed by the end of 1945.

Accordingly, the decisions of the Tax Court are affirmed in so far as they disallowed the deduction of the legal expenses; but the finding as to the termination of the estate is reversed, and the matter is remanded for such further proceedings or calculations as are necessary, consistent with the views expressed herein.

It should be noted that STRUM, Circuit Judge, participated in the hearing and decision of this cause, but died before the opinion was filed.

---

6. 26 U.S.C.A. § 161(a) (3).

7. See Code of Federal Regulations, Cumulative Supplement, 1938–43, Title 26, Section 29.162–1, pp. 6358–6359.