RICHARD BAIER AND ILA F. BAIER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3260-73.    Filed February 3, 1975.

*Harold Druse,* for the petitioners.
*Timothy L. Nelson,* for the respondent.

STERRETT, *Judge:* The respondent determined deficiencies in petitioners' income tax for the calendar years as follows:

| Year | Deficiency |
|------|------------|
| 1969 | $1,622 |
| 1970 | 1,599 |
| 1971 | 1,470 |

The sole issue in controversy is whether certain legal expenses qualify as an ordinary expense under section 212(1), I.R.C. 1954,[1] or whether said expenses must be capitalized and offset against the capital gain realized from the disposition of a capital asset.

### FINDINGS OF FACT

Most of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Richard Baier (hereinafter petitioner) and Ila F. Baier are husband and wife residing in New Brunswick, N. J., at the time of the filing of their petition herein. Petitioners filed joint Federal individual income tax returns with the district director of internal revenue at Newark, N. J., for the calendar years 1969, 1970, and 1971.

Petitioner was first employed by the American Smelting & Refining Co. (hereinafter American) in June 1933 as a laboratory assistant in the research department. Over a period of several years petitioner received job promotions at American. On March 13, 1953, he became chief engineer of copper

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

development, a division of American's central research department. He held this position until retirement.

In conjunction with this last promotion petitioner and American entered into an employment contract. The contract provided in pertinent part:

4. * * * The First Party herein is engaged for the specific purpose of making scientific investigations, studies, experiments and discoveries, as well as for the specific purpose of making, devising and/or completing inventions or processes in (1970); or in part, or any improvements thereon, for and in behalf of the Company.
* * *

7. The said First Party agrees that he will forthwith disclose and assign to the Company all discoveries, processes and inventions made or conceived in whole or in part by him, alone or in conjunction with others, during his employment, relative to or useful in any business carried on by the Company or by any company owned by it, and the said discoveries, processes and inventions shall become and remain the property of the Company whether or not patent applications thereon are filed. Upon request of the Company and at its expense, the said First Party agrees to make application through the attorneys of the Company for letters patent of the United States and of any other countries where obtainable, on said discoveries, processes and inventions, and forthwith to assign all such applications and the letters patent thereon to the Company, or its order; and further without charge for his services, to give the Company and its attorneys, all reasonable assistance in preparing said application and drawing the claims, and from time to time, upon request, to execute all papers and do all things required in order to protect the rights of the Company and vest in it or its assigns the discoveries, processes, inventions, applications and letters patent herein provided for. * * *

8. Under the provisions of Executive Committee Circular No. 605, dated May 10, 1932, employees of the Company making inventions in the course of their employment useful in the business of the Company, may derive certain benefits therefrom in accordance with the terms and conditions in said circular set forth; but the granting of such benefits is discretionary with the Company and the provisions of such circular are subject to withdrawal or change without notice.

The Executive Committee Circular Letter No. 605 (hereinafter circular No. 605) incorporated in the employment contract provided in pertinent part:

For the double purpose of stimulating interest and encouraging effort among employees in the discovery of new improvements and inventions, useful in the business and operations of the Company, and of giving due recognition to successful accomplishment on the part of employees in this field, it will be, as heretofore, the policy of the Company to reward in proper measure those of its employees who may be responsible for any new process, device, suggestion,

invention or discovery which in its opinion is of substantial value or importance. In granting any such rewards, the following principles shall govern:

\* \* \*

(2) If the Company shall grant to any other person or corporation other than itself the right to make, use or vend any such new process, device, suggestion, invention or discovery, by license, assignment or otherwise, in consideration of the payment to it of royalties or other compensation or return in money, or shall otherwise exploit the same for financial gain or profit otherwise than by its own utilization thereof in its own business or operations, it will give to the employee or employees making or developing such new process, device, suggestion, invention or discovery a share or participation in the net proceeds, gain or profits realized. The amount of such share or participation, in cases arising out of work or investigations conducted by the Research Department, or out of employment in that Department, shall be fifteen per cent (15%), and, in cases arises in other Departments of the Company or out of employees in such other Departments, shall be thirty-three and one-third per cent (33⅓%).

\* \* \*

The provisions of this circular are subject to withdrawal or change without notice, and are to be deemed a part of the contract of employment of each employee of the Company and its subsidiary corporations.

Between March 1953 and March 1962 petitioner had several patents issued and recorded in his name and that of a coinventor, when applicable. The rights to these patents were assigned to American pursuant to the employment contract. American licensed several of these patents to another corporation. In accordance with the employment contract and the terms of circular No. 605 petitioner received $750 as his share of the net proceeds paid by the licensee to American.

In June 1962 petitioner, as coinventor, obtained another series of patents. These patents had been reduced to practice in August 1961. These patents were also assigned to American, who licensed them to various corporations. Payments to American on these licensing agreements began in November 1962.

In May 1962 American amended circular No. 605 by issuing Executive Committee Circular Letter No. 995 (hereinafter circular No. 995). Circular No. 995 is identical to circular No. 605 in all material aspects except that the payments made by American to its employees responsible for inventions would be limited to $20,000 per year and would only be paid while the employees were actively employed at American. Petitioner was requested to sign a new employment contract which is similar to the employment contract signed in March 1953 in all material

aspects except that this contract incorporated the terms of circular No. 995.

Petitioner objected to the terms of the new contract and retained legal counsel to protect his interests. A suit was brought against American in which petitioner attempted to have the terms of the original employment contract and circular No. 605 upheld. The complaint recited the factual history and also alleged that the benefits from licensing the invention reduced to practice in August 1961 would be substantial and correspondingly the amounts paid to the inventors (including petitioner) would be substantial. Accordingly, American amended circular No. 605 with the limiting provisions of circular No. 995 in May 1962.

Before the judicial proceedings were concluded a settlement was reached between American and petitioner in February 1964. According to its terms petitioner was to receive a sliding percentage of the first $866,666 in net royalties received by American. These payments to petitioner were not conditioned on his continued employment at American. This represented a full settlement of the dispute with respect to the June 1962 patent and petitioner's rights under the terms of circular Nos. 605 and 995.

Petitioner has received payments from American according to the terms of the settlement. These payments have been properly reported as long-term capital gains since they have been deemed to fall within the provisions of section 1.1235-1(c)(2), Income Tax Regs.

Petitioner's legal counsel was retained on a contingent fee basis, consisting of a percentage of the payments made by American to petitioner. Payments were made by petitioner to his attorney in the years 1969, 1970, and 1971 and were claimed as a miscellaneous ordinary deduction on the tax returns for those years.

Respondent has disallowed these payments as ordinary deductions and recharacterized them as capital expenditures as follows:

It is determined that [the payments in 1969, 1970, and 1971 deducted] as legal fees in connection with preservation of income represent a capital expenditure incurred in the disposal of your inventions. The origin and character of the litigation was your right to participate in the amounts received by American Smelting and Refining Co. from the licensing of your inventions.

The amounts received by you were considered to be from the sale or exchange of an asset subject to tax at capital gain rates.

OPINION

The sole issue presented for our determination is whether certain legal expenses constitute an ordinary deduction under section 212(1) or a capital expense to be offset against the capital gain realized from the disposition of a capital asset. Secs. 1001, 1016, and 263. The statutory scheme, though deceptively straightforward, has been the subject of much litigation.

Section 212 provides in part:

SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

It is well established that this section does not expand the category of deductible expenses. Its purpose was "merely to enlarge 'the category of incomes with reference to which expenses were deductible' " by removing the requirement that the expense be incurred in connection with a trade or business. The remaining limitations are still applicable. *United States v. Gilmore*, 372 U.S. 39, 45 (1963).

Section 263 provides in part:

SEC. 263. CAPITAL EXPENDITURES.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

Included in those expenses to be capitalized are those that are for the acquisition or disposition of capital assets. *Woodward v. Commissioner*, 397 U.S. 572, 575 (1970); *United States v. Hilton Hotels*, 397 U.S. 580 (1970); secs. 1.212-1(n) and 1.263(a)-2(a), Income Tax Regs. These expenditures are included in "the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain * * * when the asset is sold." *Woodward v. Commissioner, supra* at 574-575; sec. 1001.

Petitioner's primary contention is that these legal fees were incurred to enforce a fully executed contract complete as to its terms. As such the expenditures plainly qualify as incurred in the collection of income within the terms of section 212(1). Respondent disputes this point arguing that the expenses were

incurred to arrive at a fair price to compensate petitioner in accordance with American's policy. As such these expenses were incurred in disposing of a capital asset and must be capitalized.

Respondent points to the terms of the March 1953 employment contract which stated that such compensation was discretionary and the provisions of circular No. 605 which were subject to withdrawal or change without notice. Respondent argues then that petitioner's contract was not complete until final settlement was reached on petitioner's law suit initiated as a result of American's unilateral amendment to the circular.

The facts are in large part uncontested. Petitioner worked for many years for American. In March 1953 he became chief engineer of copper development, a division of American's research and development department. At this time petitioner entered into an employment contract with American. Under this contract petitioner was required to assign to American all rights to any patents developed by him. American was then authorized to license these patents to other corporations. In return petitioner was to receive a percentage of the net proceeds from the licensing arrangements. The terms of these payments were established by circular No. 605 which was incorporated into the terms of the employment contract. However, American reserved the right to change or withdraw the circular without notice.

In 1961 petitioner was partly responsible for reducing to practice a new production process. Before the patent was finally obtained and assigned to American, it was thought that this patent would produce substantial benefits for American. Correspondingly, American would be required to make substantial payments to petitioner.

In May 1962 American withdrew circular No. 605 and adopted circular No. 995, which was similar in all material respects to the earlier circular with the important exception that the payments American would make to petitioner would be limited to $20,000 per year and would be made only while petitioner was actively employed. American also requested petitioner to sign a new employment contract which was similar to the one signed in March 1953 saving it incorporated the terms of circular No. 995.

Petitioner objected to the terms of the new employment contract and circular and hired an attorney to protect his interests. A suit was brought against American requesting the terms of the original employment contract and circular be

upheld. Before a judicial decision, an agreement was reached that marked a complete settlement of petitioner's rights with respect to the payments petitioner was to receive from the licensing of this patent.

Petitioner has received payments from American under the terms of the settlement. It is agreed by the parties that these amounts have been properly reported on petitioner's tax returns as long-term capital gain, during the years in question, since they have been deemed to fall within section 1.1235-1(c)(2), Income Tax Regs. Petitioner's attorney was retained on a contingent fee basis, consisting of a percentage of the payments made by American to petitioner. These legal fees have been deducted on petitioners' tax returns, during the years in question, as a miscellaneous ordinary expense.

Legal fees are not automatically deductible under the Internal Revenue Code. See *United States v. Gilmore, supra* at 48. An examination must be made into the nature of the claim that gave rise to the fees. The Supreme Court, in *United States v. Gilmore, supra* at 49, said:

we resolve the conflict among the lower courts on the question before us * * * in favor of the view that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test * * *

The Supreme Court has recently applied this test to the statutory provisions in issue in this case, when it said in *Woodward v. Commissioner, supra* at 577:

In our view application of the latter regulation [1.263(a)-2(a), Income Tax Regs.] to litigation expenses involves the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself.

This holding of the Supreme Court has been held to favor "an expansive application, rather than a narrow circumscription, of the phrase 'incurred in the * * * disposition of a capital asset.'" *Helgerson v. United States,* 426 F. 2d 1293, 1298 (C.A. 8, 1970). See also *Beerman v. United States,* 390 F. 2d 638 (C.A. 6, 1968); *Anchor Coupling Co. v. United States,* 427 F. 2d 429 (C.A. 7, 1970); *Stass Reed,* 55 T.C. 32, 40 (1970); *Vincent Boagni, Jr.,* 59 T.C. 708, 713 (1973).

To determine the origin of the questioned legal expenses we must examine all of the facts involved.[2] We must consider "the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all the facts pertaining to the controversy." *Vincent Boagni, Jr., supra* at 713. We are mindful of the opinion expressed in Justice Jackson's dissent, joined by Justice Frankfurter, in *Lykes v. United States*, 343 U.S. 118 (1952), in which he feared this test, applied in a "but for" sense, could produce ludicrous results.[3]

After a careful review of the record we believe that petitioner's legal action and the resulting legal expenses have their origin in the disposition of a capital asset and must be capitalized. Although it was American's policy to reward those employees who developed patentable processes, the March 1953 employment contract and circular No. 605 clearly state that such rewards were discretionary and subject to withdrawal without notice. Under these terms American had the right to amend the manner in which petitioner was to be rewarded.

When petitioner refused to accept the new terms, disagreement arose with respect to the manner and amount of petitioner's benefits. The law suit was instituted to determine petitioner's rights under the March 1953 contract pursuant to which petitioner was required to assign this patent to American. When a capital asset is disposed of, expenses incurred to fix the sales price are clearly in the process of disposition and must be used to produce the resulting gain realized. *Woodward v. Commissioner,*

---

[2] Since we must make a determination as to the origin of petitioner's legal expenses, we have drawn no inferences from the fact that his legal action against American was ultimately settled.

[3] Justice Jackson said in his dissenting opinion in *Lykes v. United States*, 343 U.S. 118, 128 (1952):

"A majority of my brethren seem to think they can escape this conclusion by going further back in the chain of causation. They say the cause of this legal expense was the gift. Of course one can reason, as my brethren do, that if there had been no gifts there would have been no tax, if there had been no tax there would have been no deficiency, if there were no deficiency there would have been no contest, if there were no contest there would have been no expense. And so the gifts caused the expense. The fallacy of such logic is that it would be just as possible to employ it to prove that the lawyer's fees were caused by having children. If there had been no children there would have been no gift, and if no gift no tax, and if no tax no deficiency, and if no deficiency no contest, and if no contest no expense. Hence, the lawyer's fee was not due to the contest at all but was a part of the cost of having babies. If this reasoning were presented by a taxpayer to avoid a tax, what would we say of it? So treacherous is this kind of reasoning that in most fields the law rests its conclusion only on proximate cause and declines to follow the winding trail of remote and multiple causations."

397 U.S. 572 (1970). Or to put it as the Third Circuit did in *Munson v. McGinnes*, 283 F. 2d 333, 335 (C.A. 3, 1960):

If the problem is to reach mutually satisfactory or binding terms of sale, the problem is one of disposing of the property, not of collection, and the question of capitalization must be faced.

Petitioner also argues that section 1.263(a)-2(a), Income Tax Regs., does not apply in this case since it was written with reference to sections 1221 and 1222(3) which historically have not included patents within their provisions. He argues that the "intrinsic nature of the transfer of a patent is not such that it falls within section 1221, defining capital assets and thus such a transfer was dealt with in a separate Section, * * * [sec. 1235] as a matter of congressional largesse."

Petitioner's argument is ingenious and we compliment him on it; however, we must reject it. Before the adoption of section 1235 a taxpayer could qualify the proceeds from the sale of a patent for capital gain treatment if he could prove he was not in the trade or business of being an inventor. If he could not prove that, then the patent, in his hands, was an item held for sale in the taxpayer's trade or business. One of the purposes of section 1235 was to remove the fuzzy distinction between an amateur and professional inventor. Historically the capital asset status of a patent, like any other property, rested on a determination of the nature of the property in the taxpayer's hands. H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 82, A279 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 113, 438 (1954). We also note that the Income Tax Regulations promulgated under both the 1939 and 1954 Internal Revenue Codes exclude a patent from the term "similar property" that appears in section 117(c), I.R.C. 1939, as amended, and section 1221(3). Sec. 29.117-1, Regs. 111; sec. 1.1221-1(c), Income Tax Regs.

Under section 1235(a) "A transfer * * * of property consisting of all substantial rights to a patent, * * * by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months." Since petitioner has met the provisions of section 1235, as amplified in section 1.1235-1(c)(2), Income Tax Regs., a qualifying transfer has taken place. Under the circumstances the property involved is considered to be a capital asset. Since we believe that the legal fees in question were incurred as

part of the transfer, all the expenses incurred in the transfer of a capital asset must be capitalized. *Woodward v. Commissioner, supra.* The fact that the component parts of the transfer—the assignment of the patent rights and the establishment of the sales price—were separated by several years is not relevant. *Munson v. McGinnes, supra.*

In addition, since a valid transfer has taken place there has been a "sale or exchange of a capital asset held for more than 6 months." Sec. 1235(a). This is the exact language used to define a long-term capital gain in section 1222(3) which is the section petitioner has used to characterize his gain. Since petitioner admits that section 1.263(a)-2(a) applies to section 1222(3), his argument must fail for this reason also.

Petitioner urges us to follow *Commissioner v. Doering*, 335 F. 2d 738 (C.A. 2, 1964), affirming 39 T.C. 647 (1963), in which legal expenditures were held to qualify as ordinary deductions under section 212(1). Although that case was decided before *Woodward v. Commissioner, supra,* and *United States v. Hilton Hotels,* 397 U.S. 580 (1970), we believe it is still consonant with those decisions.

In that case the taxpayer was a shareholder in a corporation that was engaged in producing motion pictures. It contracted with another corporation for the latter to distribute and exhibit motion pictures which it was to produce. The taxpayer's corporation was to receive a percentage of the receipts from the distribution and exhibition activities. A dispute arose over the amount that was due.

Before the dispute was settled, the taxpayer's corporation was dissolved. The claim which had no ascertainable fair market value at dissolution, was distributed to the shareholders. Ultimately the claim was settled and the taxpayer reported his share of the proceeds as long-term capital gain under section 331(a)(1). The legal fees incurred in connection with the settlement paid by the taxpayer were deducted as an ordinary and necessary expense under section 212(1).

The circuit court in upholding the taxpayer said that the critical determination was "what the stockholders were trying to get, not the rate at which Congress chose to tax what they got." *Commissioner v. Doering, supra* at 741. What was being pursued was the proceeds from the grant of the right to distribute and exhibit the corporation's films. Such receipts would have been

taxable to the corporation (if it had remained in existence) as ordinary income. This claim did not arise from the sale of a capital asset. The taxpayer was able to report his proceeds as long-term capital gain because of the intervening dissolution and the fact that the claim could not be valued at dissolution which held the liquidation open for tax purposes. This fact was entirely unrelated to the origin of the taxpayer's lawsuit.

Both petitioner and respondent rely on *Munson v. McGinnes, supra,* a decision by the circuit court in which appeal in this case would lie. *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971). In *Munson v. McGinnes, supra,* there was a successful effort to reopen the original terms of a sale due to underlying fraud. The legal fees incurred were deducted under section 212(1).

The court characterized the legal claim as being from "the seller's position, an expense of modifying [the] terms of sale, incurred as an essential incident of a capital transaction in the disposition of property." *Munson v. McGinnes, supra* at 335. The court went on to hold that these legal fees exhibited the characteristics of selling expenses and belonged in the category of capital expenditures.

Petitioner seeks to distinguish that case by arguing that in the case at bar the legal claim was to enforce a contract whose terms were final. As noted earlier we do not believe the terms of the employment contract were final with respect to the disposition price. Petitioner's grounds for distinction are inapplicable.

Finally petitioner argues that a decision for respondent will effectively strip section 212 of its vitality when the income to be collected is capital gain income. We do not believe this will be true. See *Munson v. McGinnes, supra;* cf. *Beerman v. United States,* 390 F. 2d 638 (C.A. 6, 1968). Under section 1.212-1(b), Income Tax Regs., "The term 'income' for the purpose of section 212 includes not merely income of the taxable year * * * but applies as well to gains from the disposition of property." However, section 1.212-1(n) clearly states that "capital expenditures are not allowable as nontrade or nonbusiness expenses." See sec. 263 and sec. 1.263(a)-2(a), Income Tax Regs.

We concede that on occasion distinctions between these provisions may be difficult to draw. We take note, however, of the Supreme Court's statement in *Woodward v. Commissioner, supra* at 578, to the effect that: "The standard here pronounced may,

like any standard, present borderline cases, in which it is difficult to determine whether the origin of particular litigation lies in the process of [disposition]." (Fn. omitted.)

Having found that the legal expenses involved in this case have their origin in the disposition of an asset that is capital in nature, we believe the respondent's determination must be upheld.

*Decision will be entered for the respondent.*

