WALTER W. CRUTTENDEN AND FAY T. CRUTTENDEN, PETITIONERS[1] v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9037–75.     Filed May 8, 1978.

---

[1] This opinion supersedes T.C. Memo. 1978–4, filed Jan. 3, 1978, which was withdrawn by order dated May 8, 1978.

*Lewis M. Porter, Jr.*, for the petitioners.
*Harmon B. Dow*, for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in Federal income tax for the taxable year 1971 in the amount of $12,644. The issues for decision are as follows:

(1) Whether legal expenses paid by petitioner Fay T. Cruttenden to recover securities from a brokerage firm of which she was a shareholder represent a loss on a transaction entered into for profit under section 165(c)(2),[2] or were ordinary and necessary expenses paid for the management, conservation, or maintenance of property held for the production of income under section 212(2);

(2) Whether legal expenses paid by petitioner Fay T. Cruttenden to recover interest on a loan to the corporation were ordinary and necessary expenses paid for the collection of income under section 212(1); and

(3) Whether expenses for legal advice in connection with making a loan of securities is an ordinary and necessary expense for the management, conservation, or maintenance of property held for the production of income under section 212(2).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and supplemental stipulation of facts and attached exhibits are incorporated herein by reference.

Mr. Walter W. Cruttenden, Sr. (hereinafter referred to as Walter, Sr.), and Mrs. Fay T. Cruttenden (hereinafter referred to as petitioner) are husband and wife and at the time of filing their petition were legal residents of Corona del Mar, Calif. In 1971 petitioner and her husband filed a joint U.S. Individual Income Tax Return with the Internal Revenue Service Center at Fresno, Calif.

On January 3, 1963, petitioner lent $100,000 to Command Securities, Inc. (Command), at 6-percent interest under a loan agreement which subordinated the debt to other obligations of the corporation.[3] On March 1, 1963, petitioner acquired 500

---

[2] All code section references are to the Internal Revenue Code of 1954.

[3] This loan was made subject to a subordinated loan agreement which provided that Command could use the proceeds of the loan as part of its capital and subject to the risk of the business.

shares of Command for $50,000 cash. Command, formerly Cruttenden and Co., Inc., was a California corporation engaged as a broker-dealer in securities. Command was a member of the Midwest Stock Exchange and the Pacific Coast Stock Exchange at all times involved in the instant case. Mr. Walter W. Cruttenden, Jr. (Walter, Jr.), and Mr. James R. Cruttenden (James), are the sons of petitioner and Walter, Sr., and along with petitioner owned the controlling interest in Command. As of January 30, 1970, they held over 83 percent of Command's voting stock and approximately 70 percent of all Command stock. Petitioner owned 18 percent of Command voting stock.

Petitioner and Command entered into another loan agreement on December 7, 1964, under which petitioner lent certain securities and cash to Command.[4] The agreement provided that Command could use the securities and cash in its business and allowed Command to hypothecate the securities to secure loans from banks or other lenders. Petitioner could withdraw any of the securities upon substituting cash or other securities of comparable quality and value. Upon termination of the loan any cash or securities belonging to petitioner would be returned to her and if the exact securities were not available Command agreed to deliver to petitioner securities which were acceptable to her and of a comparable quality and value. The agreement also provided that the right to demand or receive payment or return of the borrowed securities, whether in the form of securities or cash, was expressly subordinated to the claims of all present and future general creditors of Command.

In May 1969, Walter, Jr., and Mr. Anthony K. Nex discussed an idea (Command concept) which was designed to provide certain services to independent broker-dealers, in order to eliminate a substantial portion of the independent broker-dealers' overhead. The Command concept included providing computerized account services, handling certain mutual fund transactions, providing research ideas, and providing the opportunity for independent broker-dealers to handle underwritings in coordination with other broker-dealers. As a result of this discussion Mr. Nex was employed by Command to implement the Command concept. Two additional corporations were organized

---

[4]The agreement did not provide for any interest payment. All dividends from the borrowed securities were transferred to petitioner by Command.

(Command Group, Inc., and Command Management, Inc.). Command Group, Inc., was organized to own the computer that would be used in accomplishing the back office customer accounting operations. Command Management, Inc., was organized to provide managed account services. Its function was to offer the broker-dealer an opportunity to place large individual accounts under professional management.

The management of the three Command companies anticipated operations in 11 Western States. To operate a block trading department (Command concept) successfully, a substantial amount of working capital was required. However, Command's financial condition was inadequate to implement the Command concept and, therefore, it was necessary to obtain the necessary working capital from outside sources.

Walter, Sr.,[5] was the owner of 4,000 shares of ARA Services stock during 1969. He consulted with his attorney, Mr. Donnelly, to examine the possibilities of lending his shares of ARA Services stock to Command. Walter, Sr., was an officer of Walston & Co. He sought legal advice concerning the transfer of his ARA Services stock because he was concerned about possible conflicts of interest and SEC violations due to his position with Walston & Co. On September 16, 1969, he lent the 4,000 shares to Command pursuant to the December 7, 1964, loan agreement between petitioner and Command. No evidence was introduced to show the terms of this transfer regarding the date of repayment, interest charged, if any, or what agreement, if any, existed between petitioner and Walter, Sr., or petitioner and Command (all dividends of ARA stock were delivered to petitioner by Command). On December 19, 1969, Command borrowed $730,000 from the First National Bank of Chicago, Chicago, Ill. Command pledged certain securities as collateral for this loan which included Walter, Sr.'s 4,000 shares of ARA Services stock. In addition, Command borrowed $91,000 from the Harris Trust & Savings Bank, Chicago, Ill. The collateral used for this loan was comprised of stock which petitioner transferred to Command pursuant to the loan agreements.

The loan obtained from the First National Bank of Chicago was an "in-transit" loan.[6] Walter, Sr., who at the time of the

---

[5]Walter, Sr., was not a customer of Command. He never held any stock in Command, and was never an officer of Command.

[6]As characterized by Mr. Donnelly, petitioner's attorney.

loan negotiations lived in California, agreed to send the ARA Services stock to the bank if it would agree to lend Command $730,000. The bank did in fact lend the money to Command but did not receive the ARA stock and proposed to terminate the agreement with Command and call the loan if it did not receive the ARA stock as collateral. Mr. Donnelly conferred with bank officials to resolve this problem. Pursuant to this conference, the ARA stock was delivered to the bank.

During December 1969, officers of Command discussed the possibilities of selling Command to Systems Capital Corp. (Systems). Mr. Nex, who was Command's executive vice president, was working in Command's Chicago office and was in the process of promoting the Command concept. He became aware of these discussions with Systems and was in favor of selling only a part of the Command companies.

In December 1969, Mr. Nex went to Phoenix to meet with the board of directors of Systems to further discuss the acquisition by Systems of the Command companies and to explain the Command concept. At that meeting, Mr. Nex told Don L. Benscoter, president of Systems, that before Systems decided to acquire the Command companies he should wait until Command's audit was completed. Mr. Benscoter expressed an interest in the Command concept and was not primarily concerned with Command's upcoming audit.[7]

On January 6, 1970, Mr. Benscoter issued a news release announcing that Systems had entered into negotiations to acquire the three Command corporations. Systems eventually entered into an agreement with the shareholders of Command to acquire all of Command's outstanding capital stock in exchange solely for voting shares of its own stock. This agreement, entitled "Stock Exchange Agreement and Plan of Reorganization Between Systems Capital Corporation and the Shareholders of Command Securities, Inc.," was dated January 30, 1970. Systems also entered into similar acquisition agreements with the shareholders of Command Group, Inc., and Command Management, Inc., to acquire all the stock of those corporations. These agreements were subject to the approval of the Pacific

---

[7]Mr. Nex advised Mr. Benscoter that if Systems were to implement the Command concept on a nationwide basis an immediate cash loan of $500,000 and a line of credit of $5 million dollars would be required. Mr. Benscoter told Mr. Nex that this would not be a problem and that he would arrange for a loan and a line of credit with the Bank of America.

Coast Stock Exchange. On April 15, 1970, the Pacific Coast Stock Exchange granted its approval of the proposed exchanges of stock and reorganizations, and the closing under the agreements occurred on the same day. At the closing, Systems delivered voting shares of its own stock and no other consideration in exchange for all outstanding stock of the Command corporations.

Petitioner (as a creditor) entered into an agreement with Systems whereby Systems agreed to repay or cause Command to pay to petitioner the cash and securities she lent to Command within 6 months following approval of the exchange agreement and plan by the Pacific Coast Stock Exchange. This agreement, entitled "Repayment Agreement," was dated January 30, 1970, and, in part, provided: "The parties hereto desire to formulate a plan whereby the rights of creditors will be protected by Systems and Command in order to induce creditors to freely permit the acquisition of outstanding stock of Command by Systems."

The approval of the exchange agreement and plan by the Pacific Stock Exchange on April 15, 1970, established a due date of October 15, 1970, for the return to petitioner of her subordinated property under the repayment agreement. The Systems stock issued to the former shareholders of Command in exchange for their Command stock was pledged by the shareholders as collateral to secure performance by Systems and Command on their obligation under the repayment agreement.

Mr. Nex continued as an officer of Command which became a wholly owned subsidiary of Systems. He went to banks in Los Angeles in an effort to obtain a loan on the strength of Systems' balance sheet. His efforts were fruitless. Mr. Benscoter sent Mr. Nex to a top official of the Bank of America in Los Angeles to obtain capital but this too proved to be in vain. As a result, Mr. Nex formed an opinion that Systems was in financial difficulty.

In May or June of 1970, Mr. Benscoter met with petitioner and her husband Walter, Sr., to negotiate an extension of the date on which Systems would return petitioner's cash and securities pursuant to the repayment agreement. Systems and Command failed to return the cash and securities to petitioner on October 15, 1970; Systems' attorney advised Mr. Donnelly, petitioner's attorney, that the cash and securities would not be forthcoming because Systems did not have sufficient funds on hand as of

October 15, 1970. As a result of the discussions with Systems' attorney, Mr. Donnelly decided that the extended due date Systems was seeking for the return of petitioner's cash and securities would be much sooner than an ultimate disposition of a suit for specific performance of the repayment agreement. Therefore, Mr. Donnelly proceeded to negotiate with Systems for an extension of the due date conditioned upon an agreement with Systems which, in Mr. Donnelly's opinion, would form the basis for a summary judgment against Systems in the event it should default again.

A new agreement dated February 16, 1971, was entered into between petitioner and Systems which provided for an extension of the due date to June 30, 1971. In addition, Systems agreed to return petitioner's cash and securities except for 2,000 shares of ARA Services stock which Systems agreed to return to petitioner no later than March 10, 1971.[8] Pursuant to this agreement, Systems and Command executed an agreement for covenant not to sue, releasing any claim, defense, setoff or counterclaim they might have against petitioner arising out of the warranties or representations, covenants or obligations contained in the exchange agreement and plan.

The following was paid and returned to petitioner as provided in the February 16, 1971, agreement:

(a) Cash of $100,000 representing the principal amount of Command's promissory note dated January 2, 1963, payable to petitioner;

(b) Cash of $10,552.64;

(c) $10,054.40, representing interest at 6 percent per annum accrued from July 1, 1969, to February 16, 1971, on the $100,000 due on Command's promissory note, dated January 2, 1963, payable to petitioner; and

(d) The following securities having an aggregate fair market value when returned of $594,207:

---

[8]Walter, Sr., purchased the ARA Services stock in 1959. His basis in such stock was $1.67 per share. On Oct. 15, 1970, when the stock was to be returned to petitioner, the highest and lowest quoted selling prices for ARA Services were 110½ and 108½. Because of his low basis in this stock, Walter, Sr., was concerned about the extension of the due date to June 30, 1971, and instructed Mr. Nex to not allow the sale of such stock under any circumstances.

4,000 shares of ARA Services, Inc.
1,372 shares American General Insurance 1.80 Pfd.
  372 shares American General Insurance (common)
   20 shares Criterion Insurance
  500 shares Lender International Industries

Petitioner and Walter, Sr., paid legal fees in 1971 totaling $21,764.47 to Mr. Donnelly's law firm which represented them in connection with the January 30, 1970, repayment agreement and the subsequent related negotiations and deducted them on their 1971 joint Federal income tax return as an itemized miscellaneous deduction, "legal fees for recovery of subordinated securities loaned to Command Securities."

The Commissioner, in his statutory notice of deficiency, determined that the deduction of $21,774 claimed on the 1971 joint Federal income tax return, for "legal fees for recovery of securities loaned to Command Securities" was not allowable because petitioner and Walter, Sr., did not show that they were entitled to such a deduction.

## OPINION

Petitioner contends that the legal expenses paid to recover the securities and cash from Command of which she was a shareholder are deductible under the provisions of section 165(c)(2) and, in the alternative, under section 212(2). Petitioner further contends that the legal expenses paid to recover interest (6 percent) on the $100,000 lent to Command in 1963 were ordinary and necessary expenses for the collection of income under section 212(1). In addition, petitioners take the position that legal expenses paid by Walter, Sr., for advice in connection with making a loan of his ARA Services stock to Command in 1969 were ordinary and necessary expenses paid for the management, conservation, or maintenance of property held for the production of income under the provisions of section 212(2).

Respondent contends that the legal expenses paid by petitioners were expenses incurred by a shareholder in the acquisition of stock during a reorganization, and thusly, are capital expenditures which increase the basis of the stock received by the shareholder. In the alternative, respondent's argument is threefold. First, the expenses paid in recovering the principal of

the 1963 loan to Command ($100,000 at 6 percent per annum) are not currently deductible but represent capital expenditures.[9] Secondly, respondent contends that the legal expenses paid by petitioners do not represent a loss on a transaction entered into for profit under section 165(c)(2). In support of this contention, respondent argues that the loans of securities are debts under section 166 which precludes the application of section 165. Finally, respondent argues that the legal expenses paid do not come under the application of section 212 for the reason that such expenses are either capital in nature or personal.

Petitioner Fay T. Cruttenden (petitioner) owned 18 percent of the voting stock of Command, a brokerage firm in which she had invested $150,000. In December 1964 petitioner lent securities and cash to Command under loan agreements whereby the loans of stock were subordinated to other debts of the corporation. In 1969 Walter W. Cruttenden, Sr., retained counsel for advice as to the possibility of lending his ARA Services stock (4,000 shares) to Command under the same agreement whereby petitioner lent securities by having the stock placed in the loan account to Command in 1964. Walter, Sr., pursuant to his counseled advice, made such a transfer. These securities were used as collateral by Command in obtaining a loan from the First National Bank of Chicago, Chicago, Ill. When the First National Bank became concerned over the fact that it had not received the securities from Los Angeles, Walter, Sr., again retained counsel. On this occasion the attorney for Walter, Sr., negotiated with bank officials to persuade them not to call the loan which would have resulted in the bank's liquidating the collateral pledged to secure the note. The collateral included ARA Services stock. The attorneys for Walter, Sr., were successful and the loan was not called. Subsequently, the same attorneys for Walter, Sr., were retained for the purpose of recovering the cash and securities lent by petitioner to Command. The negotiations involved in the recovery began in January 1970 and continued until July 1971. The negotiations resulted in two repayment agreements, the second of which resulted in the recovery of petitioner's $100,000 loan made to Command in 1963, $10,054.40 which represented

[9]Petitioner concedes that expenses incurred in connection with the loan of $100,000 are not deductible. Respondent concedes that, if we adopt his alternative position, any amounts expended to collect interest are currently deductible under sec. 212(1). Consequently, respondent's alternative argument is directed to the two loans of securities. *Kurkjian v. Commissioner,* 65 T.C. 862 (1976).

interest of 6 percent per annum accrued from July 1, 1969, to February 16, 1970, on the $100,000 loan made to Command in 1963, repayment of cash of $10,552.64 to petitioner, and return of securities which included the 4,000 shares of ARA Services stock.

Respondent argues that the legal expenses incurred relate to the cost of acquiring Systems stock pursuant to the reorganization and, therefore, must be capitalized under section 263. We do not agree with respondent. Petitioner's status as a lender, for purposes of the reorganization, was independent of her status as a shareholder in Command. Respondent relies on a line of cases which stand for the proposition that all expenses, including legal expenses, are not deductible when such expenses are directly related to establishing the ultimate purchase price or sale of a capital asset. *Woodward v. Commissioner*, 397 U.S. 572 (1970); *Anchor Coupling Co. v. United States*, 427 F.2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); *Baier v. Commissioner*, 63 T.C. 513 (1975), affd. 533 F.2d 117 (3d Cir. 1976). However, based on the facts in the instant case, we are convinced that the subordinated loans made by petitioner were not considered in determining the purchase price of the Command stock purchased by Systems. Mr. Nex, who participated in the negotiations involving the acquisition of Command stock, testified that Systems was interested in the acquisition of the Command concept and not concerned with the outstanding subordinated loans of petitioner. Mr. Nex further testified that Mr. Benscoter, president of Systems, assured him that obtaining $500,000 as working capital, and a line of credit in the amount of $5 million, would be no problem. Therefore, that portion of legal expenses which related to the collection of interest ($10,054.40) on the $100,000 loan made by petitioner in 1963 is currently deductible under section 212(1) due to concessions made by respondent.[10]

With respect to the legal expenses incurred by petitioners from January 20, 1970, to July 12, 1971, petitioners contend that section 212(2) allows a deduction for expenses paid for the recovery of investment property. Respondent takes the position that section 1.212–1(k), Income Tax Regs., precludes the deduction for legal expenses. Section 1.212–1(k), Income Tax Regs., provides:

---

[10]See n. 7 *supra*.

> Expenses paid or incurred in defending or perfecting title to property, in recovering property (*other than investment property and amounts of income which, if and when recovered, must be included in gross income*), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. * * * [Emphasis added.]

The law is settled that expenses (including legal expenses) paid or incurred to perfect or defend title are not currently deductible but constitute a part of the cost of the property. *Boagni v. Commissioner*, 59 T.C. 708 (1973); *Reed v. Commissioner*, 55 T.C. 32 (1970); *Spangler v. Commissioner*, 323 F.2d 913 (9th Cir. 1963); cf. *Ruoff v. Commissioner*, 30 T.C. 204 (1958), revd. 277 F.2d 222 (3d Cir. 1960). However, the facts in the instant case demonstrate that the legal expenses paid by petitioners in no manner related to the title of the securities lent to Command. To the contrary, the subordinated loan agreement provided that Command had only the right to the beneficial enjoyment of the lent securities to pledge them as collateral. Title to these securities remained at all pertinent times with petitioners. Command was obligated to return the securities to petitioners upon termination of the loan agreement. In the event Command was unable to return the exact securities, it was obligated to deliver to petitioners securities which were acceptable to them in terms of comparable quality and equivalent market value. Likewise, petitioners retained the right to withdraw the lent securities upon substituting cash or securities of a comparable quality and value. In addition, petitioners received all dividends from the securities while in possession of Command. We therefore must decide whether the expenses paid for the recovery of the securities come under the provisions of section 212(2) which provide:

> In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
>
>     *     *     *     *     *     *     *
>
> (2) for the management, conservation, or maintenance of property held for the production of income;

Respondent, relying on section 1.212–1(k), Income Tax Regs., argues that the legal expenses are not deductible but are part of the "cost of the property" because the securities upon recovery were not required to be included in petitioners' gross income. Petitioners take the position that respondent's interpretation of section 1.212–1(k), Income Tax Regs., unduly restricts the

statutory scheme of section 212 by requiring the recovered investment property to be included in gross income before an expense can be deductible. We agree with petitioners for the reason that respondent's interpretation is not consistent with the language of section 212(2). Moreover, respondent's interpretation, as applied to the facts here, is contrary to section 1.212–1(a)(1), Income Tax Regs., which separately, in subsection (i), allows deductions relating to the collection of *income* which must be included in taxable income and in subsection (ii), allows deductions relating to the conservation of *property* held for the production of income. An expense paid or incurred for acquisition of property is not deductible and must be added to the cost of the property recovered in the event the property is *not* held for the production of income. By contrast, the parenthetical portion of section 1.212–1(k), Income Tax Regs., as we interpret it, allows a deduction for expenses paid or incurred for the recovery of investment property which by its very nature is held for the production of income.

Clearly the recovery of petitioners' securities lent to Command allowed them to "manage, conserve, and maintain" their investment property. Originally the securities were lent to Command for the purpose of insuring the development of the Command concept as well as enhancing the value of Command's stock. Systems assured all interested parties that obtaining adequate financing for the further development and implementation of the Command concept would be no problem. With these representations there was no further need to continue the loan agreement that petitioners had with Command prior to its acquisition by Systems.

Section 212(1) and (2) of the Code must be read together when interpreting the parenthetical portion of section 1.212–1(k), Income Tax Regs. The recovery of amounts of income refers to section 212(1) which provides for the deduction of expenses paid or incurred for the production or collection of *income*. In this regard the recovery of income must be included in gross income before the deduction is allowable.[11] See sec. 1.212–1(e), Income Tax Regs., and sec. 265. Expenses for the recovery of *property*

---

[11]An example of the deductibility of expenses incurred for the recovery of amounts of income is demonstrated by the recovery of the interest from the 1963 $100,000 loan. In this regard respondent concedes that the legal expenses attributable to this portion of the recovery are deductible under sec. 212(1).

come under the provisions of section 212(2) and the deduction is allowable only if the property is held for the production of income. Accordingly, the legal expenses incurred from January 20, 1970, to July 12, 1971, for the recovery of petitioners' investment property are deductible under section 212(2). Having decided the issue of deductibility under section 212(2), we need not address ourselves to the arguments raised by the parties with respect to the application of section 165(c)(2).

In addition petitioners argue that the legal expenses incurred for advice regarding the transfer of Walter, Sr.'s ARA Services stock to Command are deductible under section 212(2). Petitioners rely on *Bagley v. Commissioner*, 8 T.C. 130 (1947). However, in *Bagley*, the taxpayer-shareholder did not make loans to the corporation. She made loans to officers of the corporation who without such loans would have been forced to sell their own shares in the corporation thus flooding the market and depressing the value of the taxpayer's stock. Walter, Sr., was neither an officer nor shareholder of Command. Mr. Donnelly, Walter, Sr.'s attorney, testified that when Walter, Sr., sought advice about transferring his ARA stock to Command he was concerned about possible conflict of interest as well as possible violation of SEC regulations. Walter, Sr., at the time he sought legal counsel, was an officer of Walston & Co. Moreover, Walter, Sr., made numerous inquiries about his ARA stock and attempted to exercise his control over the use and disposition of it according to the testimony of Mr. Nex. Clearly from the evidence before us, the expenses incurred for advice concerning the transfer of ARA stock to Command were personal in nature and not within the provisions of section 212(2). *United States v. Gilmore*, 372 U.S. 39 (1963).

Therefore the legal expenses paid by petitioners for the recovery of interest regarding the $100,000 loan of 1963 are deductible under section 212(1) and the legal expenses paid from

January 20, 1970, to July 12, 1971, for the recovery of the securities lent to Command are deductible under section 212(2).

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, *J.*, concurring: Except for section 212(3), section 212 is substantially unchanged from its predecessor, section 23(a)(2), I.R.C. 1939. Prior to the enactment of section 23(a)(2), section 23 allowed deductions only for expenses incurred "in carrying on any trade or business," i.e., the deductions presently authorized by section 162(a), I.R.C. 1954, or then section 23(a)(1), I.R.C. 1939. If a profit-seeking activity did not constitute the carrying on of a trade or business, expenses incurred in connection therewith were not tax deductible. In enacting section 23(a)(2), Congress sought to remedy this inequity. Section 23(a)(2) " 'is comparable and *in pari materia* with section 23(a)(1)' providing for a class of deductions 'coextensive with the business deductions allowed by section 23(a)(1), except for' the require-ment that the income-producing activity qualify as a trade or business." *United States v. Gilmore*, 372 U.S. 39, 45 (1963), citing *Trust of Bingham v. Commissioner*, 325 U.S. 365, 373 (1945). Therefore application of the above statutory intent to expenses incurred for the recovery of property, with title not in issue, used by a taxpayer in his trade or business should have the same tax consequences as that of a taxpayer recovering property held for the production of income. For example, if an automobile leasing company rented an automobile and later incurred legal expenses in recovering the car, clearly, such expenses are deductible. Therein, title was not in issue. Similarly, as in the instant case, legal expenses incurred in the recovery of property held for the production of income, title not in issue, should be deductible.

Moreover petitioner's legal expenditures paid for the recovery of securities lent to Command were for the purpose of *conserving* and *maintaining* her income-producing property. They were not for the purpose of improving or changing, in any way, her title to such property; they did not add to or increase the value of her property or her wealth and, thus, cannot be

considered capital in nature. In my opinion, as title was never in issue and the property was income producing, the legal expenses herein must be considered conservatory in nature and deductible under section 212(2).

RAUM, *J.*, agrees with this concurring opinion.

SIMPSON, *J.*, dissenting: In my view, the petitioner's expenditures to recover her stock failed to satisfy the basic principles of section 212: First, under that section, the deductibility of legal expenditures turns on the origin of the claim; second, under that section, it is necessary to distinguish between capital expenditures and ordinary and necessary expenses, and capital expenditures are not deductible. Consequently, I must dissent.

In *United States v. Gilmore*, 372 U.S. 39 (1963), the taxpayer sought to deduct his legal expenses incurred in resisting the claim of his wife to a share of his property in a divorce proceeding. Initially, the Supreme Court observed that " 'conservation of property' seems to refer to operations performed with respect to the property itself, such as safeguarding or upkeep, rather than to a taxpayer's retention of ownership in it." 372 U.S. at 44. The Court rejected the contention that any expenditures to conserve investment property are, without more, deductible. The Court held that since the wife's claim grew out of the personal relationship with the taxpayer, and not out of an income-producing activity, the expenditures in resisting it were not deductible.

In the case before us, the controversy grew out of the petitioner's transfer of her stock to Command. She did not expect to receive any profit from such transfer, but sought only to enhance her investment in Command. Thus, the claim originated in a transaction, not entered into for a profit, but more in the nature of a capital transaction.

The enactment of the predecessor of section 212 extended to investment property the same rules which applied to business transactions. *United States v. Gilmore*, 372 U.S. at 44–45; *Trust of Bingham v. Commissioner*, 325 U.S. 365, 374 (1945). Under such rules, it is necessary to distinguish between capital expenditures and expenditures which are ordinary and necessary expenses, and only the latter are deductible. *Boagni v.*

*Commissioner*, 59 T.C. 708, 711–712 (1973). As stated by the Court of Appeals for the Ninth Circuit in *Spangler v. Commissioner*, 323 F.2d 913, 918 (9th Cir. 1963), affg. a Memorandum Opinion of this Court: "The nondeductibility of capital expenditures, founded upon the principle that related disbursements and receipts should be given consistent tax treatment, is * * * a basic limitation upon [sec. 212]."

In a host of cases, courts have held that legal expenses incurred in the defense or perfection of title to property are not currently deductible, but must be capitalized. E.g., *Spangler v. Commissioner, supra; Kelly v. Commissioner*, 228 F.2d 512 (7th Cir. 1956), affg. 23 T.C. 682 (1955); *Brown v. Commissioner*, 215 F.2d 697 (5th Cir. 1954), affg. on this issue 19 T.C. 87 (1952); *Boagni v. Commissioner, supra*. The rationale for such rule has been expressed by the Court of Appeals for the Fifth Circuit:

Of course, when property is held for the production of income, any expenditure which relates to the perfection or defense of the taxpayer's title to the property can, in one sense, be said to have been an expenditure for the *conservation* of the property. On the other hand, it seems equally as sound to say that any such expenditure is more properly an element in the cost of acquiring or preserving the legal right to the income produced by the property, and therefore must be considered a capital expenditure. * * * [*Brown v. Commissioner*, 215 F.2d at 699; emphasis in original.]

When the *Brown* rationale is applied to the facts of the case before us, it is clear that the petitioner's expenditures fall on the side of capital expenditures. The petitioner's right to demand the return of her stock was expressly subordinated to the claims of all general creditors of Command. In light of Command's financial situation, the petitioner was concerned that she might lose the stock. Under these circumstances, the legal expenses clearly were incurred to preserve her right to the property and the income from it. To draw a distinction in favor of the petitioner's expenditures because possession, as distinguished from title, was at issue would rest the rule on shifting sands. In either event, the petitioner is attempting to retain her income-producing property against the threat of its loss, and the expenditures for such purpose are capital in nature.[1] *Reed v. Commissioner*, 55 T.C. 32, 42 (1970).

The rule that the expenditures to recover income-producing

---

[1]Although *Allen v. Selig*, 200 F.2d 487 (5th Cir. 1952), and *Ruoff v. Commissioner*, 277 F.2d 222 (3d Cir. 1960), revg. 30 T.C. 204 (1958), draw a distinction between recovery of possession and title, such

property are not deductible has been applied to deny a deduction for the costs of recovering the principal of loans in default. *Kurkjian v. Commissioner*, 65 T.C. 862 (1976); *Kelly v. Commissioner*, 23 T.C. 682 (1955), affd. 228 F.2d 512 (7th Cir. 1956). Money is of course a form of property, and there is no reason to treat the expenses of recovery of money differently under section 212.

Nor do I believe that deductibility of the legal expenses in this case can be founded upon the language of the regulation. The entire text of the regulation, which was not quoted by the majority, is as follows:

(k) Expenses paid or incurred in defending or perfecting title to property, in recovering property (other than investment property and amounts of income which, if and when recovered, must be included in gross income), or in developing or improving property, constitute a part of the cost of the property and are not deductible expenses. Attorneys' fees paid in a suit to quiet title to lands are not deductible; but if the suit is also to collect accrued rents thereon, that portion of such fees is deductible which is properly allocable to the services rendered in collecting such rents. Expenses paid or incurred in protecting or asserting one's right to property of a decedent as heir or legatee, or as beneficiary under a testamentary trust, are not deductible. [Sec. 1.212–1(k), Income Tax Regs.]

The regulation reflects the basic distinction, established by the cases, between capital and ordinary and necessary expenditures. A recovery of property is treated in the same manner as a dispute over its title. However, a recovery of an item includable in income is not subject to such rule.

There is a question as to the effect of the reference to "investment property" in the parenthetical phrase. Read carefully, the reference merely indicates that the rule may not be applicable to a recovery of investment property—it does not state affirmatively that the expenditures for the recovery of investment property are deductible. Since section 212 applies only to investment property, there would be no purpose in providing that the expenditures for a recovery of property are not deductible under section 212 if such rule did not apply to investment property. It may be that the purpose of the reference

cases have been criticized by the Court of Appeals for the Ninth Circuit. *Spangler v. Commissioner*, 323 F.2d 913, 919 n. 15, 920. Moreover, such cases were decided before *United States v. Gilmore*, 372 U.S. 39 (1963).

to investment property was merely to indicate that if such property is includable in income when recovered because, for example, the loss of the property had given rise to a deduction, the expenses of such recovery may be deductible. In any event, the reference to investment property cannot justify a departure from the well-established rule that capital expenditures are not deductible under section 212, and we should adopt an interpretation of the regulation consistent with such rule.

TANNENWALD and QUEALY, *JJ.*, agree with this dissenting opinion.